**DEEP SOUTH OIL COMPANY OF TEXAS, Appellant,**

v.

**TEXAS GAS CORPORATION, Appellee.**

No. 6200.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 17, 1959.

Rehearing Denied Oct. 21, 1959.

Orgain, Bell & Tucker, Beaumont, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellant.

Marcus, Weller & Evans, Beaumont, A. A. White, Houston, for appellee.

McNEILL, Justice.

This action was brought by appellee Texas Gas Corporation, hereinafter referred to as Texas Gas, against appellant Deep South Oil Company of Texas, hereinafter referred to as Deep South, for declaratory judgment seeking the construction of certain paragraphs of a contract involving the sale of gas from the Big Hill oil field in Jefferson County made between Deep South as "seller" and by McCarthy Chemical Company, predecessor in interest of Texas Gas, as "buyer". The major questions involved are: (1) In the absence of Railroad Commission regulation, where the purchaser of gas from producers in the field is unable to take their full production, do Arts. 6049a and 6008, Vernon's Ann.Civ.St., provide a mandatory formula for ratable take of 25% open-flow potential from the wells of each producer?; and (2) May one of these producers cancel its contract for such sale of its gas in case of discrimination by such common purchaser?

The Big Hill field is a salt dome structure located in the southwestern part of Jefferson County. No field allowable or special spacing or well proration rules have ever been imposed by the Railroad Commission of Texas on this field. Deep South was one of the first producers in this field and was the first producer at Big Hill from which the predecessor of Texas Gas contracted to purchase gas. Soon after the first gas well was brought in by Deep South it and McCarthy Chemical Company executed the contract involved on February 15, 1952 which was to last for a 20 year period. It is appropriate to set out here certain paragraphs of this contract. Since the suit involves the obligation as to quantity of gas to be purchased we first quote Paragraph III(a):

"III. Quantity

"(a) Subject to the further provisions of this contract, Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive from Seller, if available, a daily quantity of gas averaged over each

year of the term of this contract equal to 1,000 MCF for each ten million (10,000,000) MCF of gas contained in Seller's recoverable reserves or seventy-five (75%) per cent of Seller's average daily deliverability during such year, whichever is the lesser quantity, provided, however, that in no event shall Buyer be obligated to take an average daily quantity of gas in excess of ten thousand (10,000) MCF. Pending the determination of Seller's recoverable reserves and daily deliverability, Buyer agrees to purchase and receive from Seller an average daily quantity of one thousand (1,000) MCF of gas."

The term "Recoverable Reserves" as used in the above paragraph and elsewhere in the contract is defined therein as follows:

"(g) The term "recoverable reserves" shall mean the quantity of gas economically recoverable from wells drilled on the dedicated leases as of the time of determination or redetermination of the recoverable reserves pursuant to Article V hereof, plus the total quantity of gas theretofore delivered by Seller to Buyer from the dedicated leases subsequent to the date of the initial delivery of gas hereunder."

Paragraphs V and XVIII of the contract are:

"V. Determination of Reserves and Deliverability—Upon the written request of either party, the parties hereto shall endeavor to determine by agreement the quantity of gas contained in Seller's recoverable reserves and Seller's estimated average daily deliverability for the next ensuing twelve (12) months. Thereafter, but not more often than once a year, upon written request of either party, the parties shall promptly endeavor to redetermine by agreement the quantity of such recoverable reserves and average daily deliverability. In the event the parties are unable to agree upon the initial determination or any redetermination within thirty (30) days after written request therefor, then the matter shall be submitted to arbitration in accordance with the provisions of Article XVIII hereof. The latest determination or redetermination shall be controlling until the next redetermination is made.

"XVIII. Arbitration—Any controversy between the parties arising under this contract not resolved by agreement shall be determined by a board of arbitration upon notice of submission given either by Buyer or by Seller to the other party also naming one arbitrator. The party receiving such notice shall, within ten (10) days thereafter, by notice to the other, name the second arbitrator, or failing so to do, the party giving notice of submission shall name the second. The two (2) arbitrators so appointed shall name the third, or failing to do so within ten (10) days, the third arbitrator may be appointed by the person who is at the time the senior judge of the United States District Court for the Southern District of Texas."

■ The contract defines the term "MCF" to mean 1,000 cubic feet. Deep South at the time held oil and gas leases from the Security State Bank & Trust Company and from C. Doornbos upon certain tracts in the field which leases were described in the contract and dedicated to its performance. After the date of this contract certain other wells were drilled by Deep South, and it transferred a tract of 80 acres it held under lease to the Delta Drilling Company. Shortly after February 15, 1952, Texas Gas succeeded as "Buyer" to the interests of McCarthy Chemical Company in said contract. Texas Gas some two years after the beginning of this contract entered into contracts with four other gas producers in this field. It is thus seen that there are six producers (including Delta) at Big Hill from whom Texas Gas purchases gas, and by virtue of this fact Texas Gas is a "common purchaser" at Big Hill with the statutory obligation imposed by Art. 6049a, Vernon's Annotated Civil Statutes, (known as the Common Purchaser Act) to purchase gas ratably. This obli-

gation is recognized by both parties to the suit.

Negotiations were started between Deep South and Texas Gas within a reasonable time after the date of said contract looking toward an agreement to establish the "recoverable reserves of gas" in the land under the leases involved. Such negotiations continued between the parties for a considerable time, during which the delivery of gas from the field to the common purchaser, Texas Gas, became greater and greater in volume. Finally, since the contracting parties could not agree on such reserves, Texas Gas invoked the arbitration provisions of the above Par. XVIII and appointed an arbitrator. Deep South refused to arbitrate and Texas Gas then appointed the second arbitrator as provided in the paragraph, and as a result an ex parte arbitration was held and an award made on May 21, 1955 which established the recoverable reserves under the Deep South at 32,957 MMCF as of April 1, 1955. During 1955 and 1956 several written requests were made by Texas Gas to Deep South to reduce the amount of its gas delivery to Texas Gas pipeline, and much correspondence developed between the parties on this score without appreciable success. At last, on September 28, 1956, Texas Gas requested Deep South to reduce its deliveries from 10,000,000 cubic feet a day to 7,000,000 which Deep South refused to do. Culminating this dispute on January 10, 1957, Texas Gas instituted this suit in the district court of Jefferson County praying for the construction of said contract and for an injunction to require Deep South's compliance therewith. It alleged that its system was connected to many high pressure wells in the area from which it took gas; that it could take gas at any one time in amounts equal to a fraction of the deliverability of these wells; that Deep South had ignored the request of Texas Gas as common purchaser to cut its deliveries and that one other such producer had refused to cut its deliveries and another was threatening to do so on account of the refusal of Deep South to reduce its deliveries; that therefore plaintiff, Texas Gas, was faced through chain reaction with complete loss and control of the gas coming into its system, subjecting it to pressures completely beyond its capacity and threatening dire consequences to persons and property. The petition prayed for a temporary restraining order which was granted and at the hearing thereon the court set the "take" from Deep South at 8,500,000 cubic feet per day which was later reduced on final trial to 7,000,000 cubic feet. Deep South filed answer to this action and urged in cross-action that the contract should be canceled both on account of fraud at its inception on the part of the buyer and because of discrimination which was practiced and was being practiced upon it by Texas Gas by cutting down its deliveries and increasing the "take" of gas from the other four producers and for damages after the cancellation date of said contract.

Texas Gas filed numerous pleas in abatement and exceptions to the cross-action of Deep South. Among the matters so urged were that since Deep South was a "natural-gas company" within the meaning of the federal Natural Gas Act, 15 U.S.C.A. 717 et seq., and was engaged in interstate commerce its contract could not be canceled without permission of the Federal Power Commission; that any allowance by the court for damages to Deep South herein would in effect increase the rate of gas which could not be allowed without approval of said commission; that since under the conservation statutes of Texas the Railroad Commission of Texas has sole jurisdiction under Art. 6049a and related articles to decide the question of discrimination the court had no jurisdiction thereof.

Both parties filed motions for summary judgment, attaching affidavits and other documents and referring to depositions taken and other instruments in the record. The trial court heard the pleas, exceptions and motions of the parties and held that he had no jurisdiction of any matter involving cancellation of the contract on account

of discrimination, nor damages for breach thereof, that there was no fraud in the inception of the contract practiced by the buyer, that the formula for ratable take between the producers by Texas Gas was on the basis of recoverable reserves; that said ex parte arbitration so conducted was valid and granted a permanent injunction against Deep South providing that: "Deep South Oil Company of Texas, its officers, agents, servants and employees, be and the same are hereby permanently enjoined from delivering into plaintiff's gathering system from the dedicated properties operated by defendant in the Big Hill Field, until requested by plaintiff so to do, gas in excess of seven million (7,000,000) cubic feet per day of twenty-four (24) hours, or such other greater or lesser amounts as plaintiff may request from time to time in accordance with said contract, beginning at 7:00 o'clock A.M. on the day following the date of the entry of this order" and requiring all requests for increase or decrease by Texas Gas to be confirmed in writing.

■ Deep South urges 11 points of error on this appeal. They will not be set out in detail, but those that we deem material to the outcome of the suit will be discussed. The first point urges that the basis or formula of "ratable take" of gas between the producers by Texas Gas should be on the basis of what it urges as the statutory 25% of open-flow potential of the wells of each of the producers involved. It contends that unless and until the Railroad Commission of Texas orders otherwise, the provisions of Art. 6049a, and particularly Sections 8 and 8aa thereof, when taken with Secs. 14 and 15 of Art. 6008, V.A.C.S., (see for text of these sections footnote below [1]) require

1. Art. 6049a:
   "Common purchaser of petroleum defined; discrimination forbidden
   "Sec. 8. Every person, association of persons or corporation who purchases crude oil or petroleum in this State, which is affiliated through stock-ownership, common control, contract, or otherwise, with a common carrier by pipe line, as defined by law, or is itself such common carrier, shall be a common purchaser of such crude petroleum and shall purchase oil offered it for purchase without discrimination in favor of one producer or person as against another in the same field, and without unjust or unreasonable discrimination as between fields in this State; the question of justice or reasonableness to be determined by the Railroad Commission, taking into consideration the production and age of wells in respective fields and all other proper factors. It shall be unlawful for any such common purchaser to discriminate between or against crude oil or petroleum of a similar kind or quality in favor of its own production, or production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the purchase of crude oil or petroleum to be marketed, such production shall be taken in like manner as that of any other person or producer and shall be taken in the ratable proportion that such production bears to the total production offered for market in such field. The Railroad Commission of Texas shall have authority, however, to relieve any such common purchaser, after due notice and hearing as hereinafter provided, from the duty of purchasing petroleum of inferior quality or grade."
   "Additional persons as common purchasers
   "Sec. 8aa. In addition to persons enumerated in Section 8, hereof, any and all other persons, association of persons, or corporations, operating any pipe line, which may now, or hereafter, purchase crude oil, petroleum, or natural gas in this State, whether they be common carriers or affiliated with common carriers or not, shall be a common purchaser of such crude oil, petroleum or natural gas, and shall purchase crude oil, petroleum or natural gas, offered it for purchase without discrimination in favor of one producer or person as against another as provided in Section 8 hereof."
   Art. 6008:
   "Production and sale of gas from common reservoir where demand is seasonal
   "Sec. 14. In order to adjust the correlative rights and opportunities of each owner to produce, use and sell gas from a common reservoir from which a portion of the market demand is seasonal or where a portion thereof fluctuates from month to month, the Commission may permit the wells in such reservoir to be produced in excess of the monthly allowable if no waste is occasioned thereby, provided (1) no well shall in any one month be permitted to produce in ex-

Texas Gas to take ratably on the basis of the portion which the allowable production of Deep South bears to the total allowable production of all producers from which Texas Gas purchases gas in the Big Hill Field, and that the trial court erred in failing to apply this formula. This position is plausible, but we have concluded that the statutes do not establish the formula insisted upon. Parenthetically we mention that although Deep South went to trial on its third amended original answer and cross-action, it was not until this late trial pleading that this formula was first asserted by it. The contended for formula does not apply for the following reasons:

▉ (1) Notwithstanding the long history of oil and gas production in this state, the great number of cases bearing thereon, the voluminous writings published on the subject and the long administration of the conservation statutes by the Railroad Commission of Texas, Deep South is unable to cite a single case, text book authority or law review note in support of its position. The long construction placed on Art. 6049a (enacted 1930, and Sec. 8aa added 1931) and its sections by the Railroad Commission is entitled to great weight. The Commission does not appear to construe the 25% open-flow potential as described in Secs. 14 and 15, Art. 6008, as a mandatory regulation but as an overall limit to production as a waste preventive measure. The Railroad Commission has established its rule 25 in connection with gas production which would indicate the Commission does not consider that the statutes set any limitation regulation thereon. This rule reads:

"Rule 25. Production of Gas to be Restrained to Twenty-Five Per Cent of Potential Capacity—When the gas from any well is being used, the flow or production shall be restrained to

cess of twice its monthly allowable or to produce at a rate in excess of twenty-five (25%) per cent of the daily producing capacity of such well as found by the Commission; that (2) when any well that has produced twice its allowable for six successive months shall be closed in until its production and allowable are in balance, and that (3) the Commission shall on the 1st day of March and September of each year, restrict production from all wells that are then overproduced to such fractional part of their monthly allowable as will bring the accumulated allowables and the accumulated monthly production in balance during the next six months. In like manner the Commission may by appropriate order permit any gas well to be underproduced for a period of six consecutive months and may allow the accumulated underproduction to be produced in addition to the regular monthly allowable during the following six months period. As amended Acts 1947, 50th Leg., p. 1059, ch. 453, § 2.

"Percentage of daily productive capacity allowable

"Sec. 15. Nothing contained in this Article shall require that the production from any gas well with a daily natural open flow of two hundred thousand (200,-000) cubic feet of natural gas or more to be restricted to a quantity less than fifty thousand (50,000) cubic feet of natural gas daily; and nothing herein shall

require that the production from any gas well with a daily natural open flow of less than two hundred thousand (200,000) cubic feet of gas to be reduced to a quantity less than twenty-five per cent (25%) of its natural open flow.

"In all common reservoirs producing both sweet and sour gas, no gas well shall be permitted to produce in excess of twenty-five per cent (25%) of its daily productive capacity; provided the Commission, upon a finding that reservoir conditions require that such percentage be increased to prevent waste, and that such increase will not create a drainage condition as between sweet and sour gas lands, may authorize an increase in such allowable production. Where the allowable production theretofore allocated to any well is more than fifteen per cent (15%) of its daily producing capacity, and the Commission finds that the production of its daily allowable from such well will cause waste due to the intermingling of sweet and sour gas, the Commission may order the production from such well restricted to fifteen per cent (15%) of its daily producing capacity, but this sentence shall not be construed to militate against the right of the Commission to fix the allowable production of any well below fifteen per cent (15%) of its daily producing capacity in carrying out the requirements of Sections 13 and 14 of this Act."

twenty-five per cent (25%) of the potential capacity of the same; that is to say, in any day (24 hours) the well shall not be permitted to flow or produce more than one-quarter of the potential capacity thereof as shown by the determination of potential provided for in Rule 24 hereof; provided that this rule shall not apply to casinghead gas * * *"

Since much of the gas produced at Big Hill is casinghead, this rule could not be used as a ratable formula to the facts before us. Furthermore, it, too, appears to be a waste prevention measure and not a formula for ratable takes.

(2) A 25% open-flow potential formula would be contrary to the object of our conservation statutes regulating oil and gas, for it would encourage inordinate drilling of wells thus bringing about waste instead of conservation.

(3) Art. 6049d, § 4, V.A.C.S., expressly provides a remedy for each producer of his prorata takes when full production exceeds the market demand. It reads:

"Sec. 4. Whenever the full production, from wells producing gas only, from any common source of supply of natural gas in this State is in excess of the reasonable market demand, the Railroad Commission shall inquire into the production and reasonable market demand therefor and shall determine the allowable production from such common source of supply, which shall be the reasonable market demand which can be produced without waste and the Commission shall allocate, distribute or apportion the allowable production from such common source of supply among the various producers on a reasonable basis, and shall limit the production of each producer to the amount allocated or apportioned to such producer."

If Secs. 8, 8a and 8aa of Art. 6049a contain a rigid statutory formula there would be no need for the above quoted Sec. 4.

(4) The courts of the state have not recognized the statutory 25% open-flow potential as a formula. In deciding the case of Corzelius v. Harrell, 1945, 143 Tex. 509, 186 S.W.2d 961, the Supreme Court was apparently unaware of such a formula as Deep South now contends exists in Art. 6049a, §§ 8 and 8aa. The court at page 966 of 186 S.W.2d stated:

"The law under consideration states in detail the manner and method the Commission may follow in prorating and regulating the daily gas well production from each common reservoir * * * To make sure that the Commission was not bound by any narrow, technical rules in carrying out the objects of this law, the Legislature was particular to give the Commission broad discretion in the exercise of its power under the provisions of this law * * *"

The case of Chenoweth v. Nordan & Morris, Tex.Civ.App., 1943, 171 S.W.2d 386, was one involving alleged discrimination in the taking of gas by a common purchaser in the Lopena field in Zapata County. The Railroad Commission had made no finding as to the ratable take to be applied between gas producers in that field and the common purchasers had applied their own formula therefor. In dismissing the complaint of two producers the court in this case said, at page 388:

"If appellants (producers) are dissatisfied with the proration which appellees (common purchasers) are enforcing in the Lopena Field the proper place to secure a hearing on that matter is before the Railroad Commission, and should the Railroad Commission again refuse to hear such hearing they could then resort to the District Court of Travis County, either by appeal or by an application for writ of mandamus. The Railroad Commission has been given exclusive original jurisdiction to fix proration for natural gas fields in this State."

Texas Gas counters Deep South's position by contending since only private rights are involved and no question of waste is present that the parties had right to and did contract making the "recoverable reserves" the formula for taking from the purchasers, and that each of these contracts so provided. Where no question of waste appears the parties may so contract. Railroad Commission v. Mackhank Pet. Co., Tex.Civ.App., 186 S.W.2d 351. But we do not believe the contract between Deep South and Texas Gas' predecessor in interest has such provision. While each of the four later contracting producers with Texas Gas had identical provisions in their several contracts with that contained in Par. III, above quoted from the contract with Deep South, the contracts applying to the other four companies contained the additional provision:

"Notwithstanding any other provisions hereof to the contrary, Buyer (Texas Gas) agrees to take gas ratably from the dedicated leases on a reserve basis, if available, in the same proportion that Buyer takes gas from other producers * * *."

It is therefore our view that Par. III of the Deep South contract has to do with the "take" or "pay" duty of the buyer while the additional paragraph found in the other four contracts is what it purports to be, a provision for ratable take. But, the common purchaser has the right to select a formula of ratable take (until the Railroad Commission shall act) as long as it does so in good faith and upon a reasonable basis. Texas Gas concedes that the basis of proration should be upon "original" recoverable reserves and it asserts it has complied with such formula. It asserts this upon the basis of the arbitration award which it claims was made in conformity with the provisions of the contract between the parties and the law applicable thereto. It says that since Deep South is a natural gas company within the meaning of the federal regulatory laws, rules and regula-

tions (Deep South Oil Co. of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882) and that since its gas goes through the Texas Gas pipeline into Texas Eastern Transmission pipelines and other interstate pipelines, that the federal statute on arbitration, 9 U.S.C.A. §§ 1–4, and especially Sec. 2 thereof, applies to the arbitration proceeding in this case. Sec. 2 of this Act reads:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

In its brief Deep South suggests that the word "evidencing" a transaction in interstate commerce means to evidence on its face such transaction and since its contract does not, Section 2 does not apply. This reasoning seems to have support in Wilson & Co. v. Fremont Cake & Meal Co., D.C., 77 F.Supp. 364, 374. Without taking position on this, we pass to other circumstances which control the question of the applicability of Section 2. The contract between Deep South and McCarthy Chemical Company was made on February 15, 1952 at a time when neither of the contracting parties knew or realized that the production of natural gas which when sold by the producer to interstate pipelines would make the producer a "Natural Gas Company" within the meaning of the federal Natural Gas Act and therefore subject to certain regulations thereunder, as it was not until 1954 that the U. S. Supreme Court so held in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. In addition, the McCarthy

Chemical Company at the time the contract was made was in the business of operating a chemical or processing plant near Winnie in Jefferson County. There is no language in the contract which indicates that the gas sold to it was to be placed in interstate commerce. It is not shown in the evidence that at the time the contract was made that the parties realized the gas field involved would be as productive as it has become. It was only through the unilateral act of Texas Gas, after the contract was made, in selling the gas to interstate pipelines that Texas Gas now claims the application of the Federal Arbitration Act. In view of what has been set out above, federal law with reference to this matter should not be applied unless it is clearly so required. We hold it is not so required but the contract in the respect under consideration should be construed with reference to the facts surrounding the parties when the contract was made. Hoffer Oil Corp. v. Hughes, Tex.Civ.App., 16 S.W.2d 901(1); Lancaster v. Wheeler, Tex.Civ. App., 266 S.W. 795(1), 10–A Tex.Jur., Secs. 176, 177, pp. 353–358. See also T. L. James & Co. v. Galveston County, 5 Cir., 74 F.2d 313, citing Gulf Production Co. v. Cruse, Tex.Com.App., 271 S.W. 886. In the cited case it was said at page 887:

> "It is well settled that in construing contracts the courts will take into consideration general customs and practices, as well as the law affecting the matters contracted about, and will presume that the parties contracted with such customs, practices, and laws in mind, unless the contrary clearly appears from the terms of the contract."

■■ Sec. 2 above quoted does not apply for an additional reason. If the question were before a federal court it is uncertain whether the law of this section would be applied in the absence of invoking the procedural clauses of the Act, (which are Secs. 3 and 4 undoubtedly applying only in federal courts) for some federal courts have held the Arbitration Act entirely remedial as contended by Deep South, citing In re Wisconsin Central Ry. Co., D.C., 74 F.Supp. 85 and Parry v. Bache, 5 Cir., 125 F.2d 493, and others have held Sec. 2 creates substantive rights as contended by Texas Gas, citing Standard Magnesium Corp. v. Fuchs, 10 Cir., 251 F.2d 455. Since Texas is within the jurisdiction of the 5th Circuit Court of Appeals, we follow its holding, if required to choose. Our own state arbitration statutes and decisions, while they encourage arbitration, allow either party to a contract providing for arbitration to withdraw before an award is made with only the penalty of damages for breach of contract. Tejas Development Co. v. McGough Bros., 5 Cir., 165 F.2d 276.

■ We now give attention to the points of Deep South urging its alleged cause of action for cancellation of the contract on account of fraud and discrimination as set out in its cross-action. In order to support its contention that fraud existed in the inducement of the making of this contract, it states that one H. V. Miller who was at the time a director and vice president of Jefferson Chemical Company during the negotiations stated to representatives of Deep South that the gas would not be put in interstate commerce, but would be used locally by it, that this was a material inducement and thereby brought about the execution of the contract. The evidence does not show that Miller had anything to do with the negotiation of the contract nor what his authority was in connection therewith except an affidavit made by A. A. White, General Counsel of Texas Gas, attached to its motion for summary judgment which stated that Miller did not have authority to negotiate such contract and had nothing to do with it. The trial court held that no evidence of fraud existed and under the circumstances we are inclined to agree. West Texas Produce Co. v. Wilson, (Sup. Ct. adopted) 120 Tex. 35, 34 S.W.2d 827, 829. But be that as it may, Deep South by its conduct subsequent to learning that its

gas was being sold in interstate commerce failed to act promptly to rescind and therefore waived the remedy of cancellation.

On the question of the right to cancel the contract based on discrimination, while the facts as to any discrimination will no doubt be developed in a new trial, based upon whether or not Texas Gas has taken ratably from the producers upon original recoverable reserves, we believe the trial court was right in holding that he had no jurisdiction over the question. It appears that Deep South was itself first in default under the contract for refusing to arbitrate. Under these circumstances the following language of Justice Alexander, in Investors' Utilities Corp. v. Challacombe, Tex.Civ.App., 39 S.W.2d 175, at page 179, is appropriate:

"One who has himself breached the contract cannot insist on performance, nor recover for breach by the other party without satisfactorily accounting for his own breach."

Since applicable statutory law is read into and becomes a part of the contract of the parties, Art. 6049a, a part of that law prohibits discrimination between producers by the common producer and provides penalties therefor. Section 11 of this article provides for daily penalty of $1,000 to be recovered on suit of the Attorney General— one-half for the state and one-half for the party discriminated against. Section 11c provides that the producer may recover damages against the common purchaser when it discriminates in favor of its *own* production. (Texas Gas has no production) Sec. 11e authorizes the Railroad Commission to request the Attorney General to bring action for mandatory injunction against "common purchaser to compel such reasonable extensions as are necessary to prevent discrimination." Section 11g provides:

"Any common purchaser of oil or gas as herein defined shall, in making purchases of royalty oil, comply with all the provisions of this Act, and shall not discriminate between royalty and/or land owners in making such purchases. Neither shall said common purchaser unreasonably delay payments to said land and/or royalty owner for said oil or gas purchased. For violation whereof in addition to the other penalties herein set out, the land and royalty owner or owners damaged thereby shall have a cause of action against said common purchaser for damages and may file suit for same in any court of competent jurisdiction in the county where the royalty lies."

It will be seen that the first sentence of this last section prohibits discrimination only as to "purchases of royalty oil" and the section therefore is inapplicable here.

As this statutory regulation provides in detail the remedies for discrimination where none existed before, Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 371, 81 L.Ed. 510, these remedies are exclusive. Vance v. Southern Kansas R. Co., Tex.Civ.App., 152 S.W. 743; Mingus v. Wadley, 115 Tex. 551, 285 S.W. 1084. We therefore hold that damages may not be recovered in this action for any discrimination that may have existed or now does so, but appellant's remedy therefor must be through the provisions of Art. 6049a and related articles of our conservation statutes. See quotation from the Chenoweth case, supra. To sustain its action for damages Deep South relies upon the language used by the Court of Civil Appeals in American Liberty Pipe Line Co. v. Agey, 167 S.W.2d 580, 585. In that case Agey, a producer, sued the pipeline company, not for damages for discrimination, but for daily penalties provided in Sec. 11 of Art. 6049a. Since the Attorney General did not institute nor join in this action the Court of Appeals held the suit could not be maintained. The court there said:

"In so far as Agey's rights under the statute may have been infringed, he had ample protection through the Commission and by suit for damages and injunction in the courts,"

upon which Deep South relies. In the first place the action was not one for damages and this language, although that of an able judge, should be considered dictum if construed as Deep South contends. But this language does not necessarily state that a suit for damages may be brought in the first instance but rather that resort should be made first to the Railroad Commission, and then appeal to the proper court of Travis County for relief. Deep South argues that Texas Gas should not be above the law but should be answerable for its acts if improperly performed under the contract. While Texas Gas is not above the law, we think it all too clear that relief from any discrimination that may be shown must first be sought before the Railroad Commission. The trial court was right in sustaining the exceptions and pleas to Deep South's action based on discrimination for an additional reason: Under either the state law, Lone Star Gas Co. v. Municipal Gas Co., 117 Tex. 331, 3 S.W.2d 790, 58 A.L.R. 797, or federal law, Huber Corp. v. Federal Power Commission, 3 Cir., 236 F.2d 550, 558, appellant may not invoke its right of cancellation based on any discrimination, since its service is affected with a public interest. While we would agree with the dissent of Circuit Judge John R. Brown in Deep South Oil Co. of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882, see at pages 889–900, it can only serve to re-emphasize the ever engulfing tide of federal control. Sec. 717(b) of the Natural Gas Act excepts from the authority of Federal Power Commission the production and gathering of natural gas but these areas of exemption are yet to be clearly defined by court construction.

■ On the question of dissolving the injunction, Deep South contends it is mandatory and in effect requires it to specifically perform the contract and delegates to Texas Gas the non-delegable judicial discretion and power to decide the amounts of delivery of gas from time to time. Since a dispute had existed for months between the parties as to the amount of recoverable reserves under the acreage held by Deep South, and Texas Gas, as we believe the contract gave it right to do, had many times requested Deep South to reduce its deliveries of gas which it has refused to comply with, thus endangering the pipeline facilities and property of Texas Gas as well as endangering the lives of persons by deliveries causing excessive pressures to develop, it was proper for the trial court to grant the order requiring Deep South to deliver from time to time the amount of gas requested. This in no sense excuses Texas Gas from taking impartially and without discrimination between the producers. We do not deem this order of the court to be mandatory in character. Appellee properly points out that there is a well-known distinction between enjoining a breach of contract and an order specifically enforcing it. The injunction granted was one prohibiting the breach of the contract and was properly granted. Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S.W. 530; Mission Independent School Dist. v. Diserens, 144 Tex. 107, 188 S.W.2d 568, 161 A.L.R. 877; 43 C.J.S. Injunctions § 80, p. 550. If upon another trial of the case it shall appear that the injunction should be modified or ended, the trial court will doubtless do so. In the meantime it should be continued in force. 24–A Tex. Jur. 393, sec. 269.

The cause is reversed and remanded for hearing to establish the amount of original recoverable reserves of gas under the lands involved, so that the formula adopted for ratable take by Texas Gas may properly be applied; otherwise the cause is affirmed.

Reversed and remanded in part and in part affirmed. · ·  ·