AMARILLO OIL COMPANY,
Petitioner,

v.

ENERGY–AGRI PRODUCTS,
INC., Respondent.

No. C–6649.

Supreme Court of Texas.

June 27, 1990.

Tom W. Reavley, Steve Selby, Austin, James C. Sanders, Amarillo, for petitioner.

Ivan Hafley, Camp Wood, Jerry Courtney, Clarendon, Broadus A. Spivey, Paul E. Knisely, Austin, William J. Lowe, Clarendon, for respondent.

## OPINION ON MOTION FOR REHEARING

RAY, Justice.

This court's opinion and judgment of March 8, 1989, are withdrawn and the following substituted.

At issue in this phase severance, oil and gas case is the ownership of gas produced from two wells, classified by the Railroad Commission as oil wells and operated by Energy–Agri Products, Inc. Amarillo Oil Company, the owner of the gas rights, sued to quiet title to the natural gas produced from these wells, and for temporary and permanent injunctions. Based on jury findings, the trial court rendered judgment that Amarillo Oil take nothing. The court of appeals dismissed the cause for want of jurisdiction, holding that the Railroad Commission had primary jurisdiction over the matter. 731 S.W.2d 113 (1987). We reverse the judgment of the court of appeals and render judgment quieting title to certain specified gas in Amarillo Oil. We hold Amarillo Oil is not entitled to injunctive relief. Having found error in the judgment of the trial court, we remand the cause in the interest of justice for a determination of Amarillo Oil's damages.

Amarillo Oil owns the gas rights under an assignment of a lease covering 61.42 acres of land located in Carson County. Energy–Agri owns the right to produce oil and casinghead gas under a farm-out agreement on the same acreage. This separation of oil rights from gas rights is common in the Panhandle Field and is known as phase severance. *See* Note, *Phase Severance of Gas Rights from Oil Rights,* 63 Texas L.Rev. 133, 133–37 (1984).

In 1952 Amarillo Oil's predecessors in interest drilled and completed the Hodges number one well in the brown dolomite formation, the uppermost producing formation of the Panhandle Field. Since that time the Hodges number one well has produced gas. In early 1982 Energy–Agri drilled and completed the Kimberlin number two well in the granite wash formation, one of the deepest producing formations of the Panhandle Field. This well, which was classified as an oil well by the Railroad Commission, produced only very small amounts of crude oil and casinghead gas.

In an attempt to increase production from the Kimberlin number two well, Energy–Agri perforated the casing higher in the well so it could produce from the brown dolomite formation. This allowed Energy–Agri to boost its rate of gas production from the Kimberlin number two well from an original "amount too small to measure" to 375,000 cubic feet a day. Production from the brown dolomite formation occurred with the knowledge and approval of the Railroad Commission. Energy–Agri also proceeded to drill and complete the Kimberlin number three well on the lease. Energy–Agri intended to perforate this well into the brown dolomite formation as it had the Kimberlin number two.

Amarillo Oil, however, filed suit to enjoin Energy–Agri from producing gas from the brown dolomite formation through its Kimberlin numbers two and three wells. Amarillo Oil additionally sought to quiet title to all the gas in the brown dolomite formation. It further pleaded for damages for the taking of its gas.

The action was tried to a jury. Amarillo Oil moved for an instructed verdict, urging that since Energy–Agri had no oil well completed in the brown dolomite, the gas it produced from that formation could not be casinghead gas. The trial court denied this motion and submitted the case to the jury on Amarillo Oil's alternative theory that the gas from the brown dolomite stratum could not be casinghead gas because no oil well could possibly be completed in that formation. Amarillo Oil failed to request any jury questions on the amount of damages. The jury answered the questions adversely to Amarillo Oil, and based on this verdict, the trial court rendered judgment

that Amarillo Oil take nothing. Amarillo Oil appealed. The court of appeals dismissed the cause for want of jurisdiction, holding that Amarillo Oil's suit was an impermissible collateral attack on matters over which the Railroad Commission had the exclusive original jurisdiction.

The title documents in this case confirm that Amarillo Oil owns the gas rights and Energy–Agri owns the oil and casinghead gas rights. The dispute is over what is included in Energy–Agri's ownership of the "casinghead gas."

### Definition of "Casinghead Gas"

■ The term "casinghead gas" is not defined in the pertinent title documents. At the time of the phase severance, however, there was a statutory definition of casinghead gas which had been in effect for many years. By failing to insert in the lease their own definition of the term "casinghead gas," the predecessors in interest to our present parties evidenced their intent to incorporate the statutory definition of "casinghead gas." *See Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 550, 18 L.Ed. 403 (1866), *quoted in Smith v. Elliott & Deats*, 39 Tex. 201, 212 (1873) ("laws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as if they were expressly referred to or incorporated in its terms"); *see also Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 626 (Tex.1987). Energy–Agri and Amarillo Oil, however, attribute different meanings to the statutory definition of "casinghead gas."

■ The Natural Resources Code defines the term as "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil." Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1988); *see also* Tex.R.R.Comm'n, 16 Tex.Admin.Code § 3.69 (West 1988). This definition is essentially identical to that existing at the time of the phase severance in this case. *Cf.* Act of Apr. 26, 1935, ch. 120, § 2(i), 44th Leg., 1935 Tex.Gen. & Spec. Laws 318, 319 (emphasis added), *repealed by* Natural Resources Code, ch. 871, art. I, sec. 2(a)(2), 65th Leg., 1977 Tex.Gen.Laws 2345, 2689 ("any gas and/or vapor indigenous to an *oil stratum* and produced from such *stratum* with oil") (emphasis added).[1]

Energy–Agri argues that the term "casinghead gas," as defined by the Natural Resources Code, simply means any gas produced from a well that has been classified by the Railroad Commission as an oil well. Because the Railroad Commission has classified the Kimberlin numbers two and three wells as oil wells, Energy–Agri concludes that any gas produced from these wells is casinghead gas as a matter of law. Amarillo Oil counters that determining title to gas based on the classification of a well is inconsistent with the statutory definition of casinghead gas and ignores the key elements of the statutory definition, i.e., that the gas be "indigenous to" and "produced from" an "oil stratum." Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1988).

The Natural Resources Code does not define the term "oil stratum." It does, however, define "oil well" as "any well that produces one barrel or more of oil to each 100,000 cubic feet of gas." Tex.Nat.Res. Code Ann. § 86.002(6) (Vernon 1978); *see also* Tex.R.R.Comm'n, 16 Tex.Admin.Code § 3.69 (West 1988). Reading this definition together with that of "casinghead gas" we see that the legislature has defined casinghead gas as any gas or vapor which is indigenous to and produced from a stratum that produces one barrel or more of crude petroleum oil to each one hundred thousand cubic feet of natural gas. Nevertheless, we must have a definition of "oil stratum" in order to apply the statutory definition of casinghead gas.

Energy–Agri argues that since this court has used the terms "horizon," "reservoir," "stratum" and "field" interchangeably, they must all be the same and therefore all mean the same as a "common reservoir." Energy–Agri then concludes that since it introduced in evidence a Railroad Commission document from 1935 stating the Com-

---

1. For purposes of this opinion, we identify the two definitions and refer to the current codification, Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1988), in textual references.

mission's then-finding that the whole Panhandle Field is one "common reservoir," it may produce gas from any of the separate formations in the field from its oil well and have it meet the statutory definition of "casinghead gas." We disagree.

Energy–Agri's argument overlooks the distinct geological facts of the cases it cites. For example, in *Bolton v. Coats*, 533 S.W.2d 914 (Tex.1975), it was alleged that there were separate oil productive horizons or segments of the Burnett sand (one formation) which were "each [a] physically separate productive stratum." 533 S.W.2d at 917. Under such geological facts, the terms "horizon," "stratum," "field" and "reservoir" would all coincide. Similarly, in *Benz–Stoddard v. Aluminum Company of America*, 368 S.W.2d 94 (Tex.1963), the allegation was that there were ten distinct "gas reservoirs, or horizons," that were "separated" and "among which there is no communication of gas." 368 S.W.2d at 96. Under such geological facts, the terms "horizons," "reservoirs" and "fields" may be used interchangeably. Such opinions do not state, and do not mean, that the terms always coincide.

The term "stratum" has a fixed meaning in petroleum geology, much like the terms "producing horizon," and "horizons" which appear in the Code.[2] A "stratum" is a single layer of rock deposited at roughly the same geological period of time which normally contains only one kind of rock. 1 H. Williams & C. Meyers, *Oil and Gas Law* § 102, at 3 (1989). Depending upon the particular geological facts, it may be the same as a "formation" if there is only one type and layer of rock that was deposited continuously and under the same general conditions, or it may be a part (one layer) of a formation.[3]

A "reservoir" refers to an underground formation favorable to the accumulation of oil and gas and in which oil or gas, or both, is trapped. It is a term generally "better illustrated than defined." 1 H. Williams & C. Meyers, *Oil and Gas Law* § 102, at 4 (1989). A reservoir may be created by a single "cap" layer of impermeable rock that prevents the hydrocarbons from moving further upward, by a geological fault that traps the oil and gas, or by a combination of faults and geological formations (including salt domes) which trap the oil and gas; the oil may be trapped in a single stratum (in which case the reservoir and the "stratum" are synonymous), or the reservoir may be comprised of several distinct strata. *Id.* at 4–5 (Figures 1–5 and accompanying text). If the geological structures comprising the reservoir are of the simpler "cap rock" form and contain several strata, then absent individual "trap" areas and similar complexities, the gas collects at the top of the fold in the upper strata, the oil collects on the sides, and water collects at the bottom. 1 W. Summers, *The Law of Oil and Gas* § 4, at 9 (1954). A reservoir is generally synonymous with a "field." *Benz–Stoddard*, 368 S.W.2d at 97. The main characteristic of a "reservoir" or "field" is that it is "physically separate" in the sense that there is no communication of the hydrocarbons with the surrounding

---

**2.** The term "producing horizon," without express statutory definition, appears in Tex.Nat. Res.Code Ann. § 86.003 (Vernon 1988), relating to what shall be regarded as separate wells in the same well bore, as follows:

If oil or gas, or both, is produced through different strings of casing set in the same well bore, the inner string through which oil or gas, or both, is produced shall be regarded as one well, and each successive additional string of casing through which oil or gas, or both, is produced from a different producing horizon through the same well bore shall be regarded as another well.

See also Tex.Nat.Res.Code Ann. § 86.002(5)(B), (C) (Vernon 1988).

**3.** A "formation" has been defined and explained in these terms:

A succession of sedimentary beds that were deposited continuously and under the same general conditions. It may consist of one type of rock or of alterations of types. An individual bed or group of beds distinct in character from the rest of the formation and persisting over a large area is called a "member" of the formation. Formations are usually named for the town or area in which they were first recognized and described, often at a place where the formation outcrops. For example, the Austin chalk formation outcrops at Austin, Texas.

H. Williams & C. Meyers, *Manual of Oil and Gas Terms* 373 (1987).

geological structures. *Bolton v. Coats,* 533 S.W.2d at 917; *Benz–Stoddard,* 368 S.W.2d at 96. Starting from the petroleum geology definition for "reservoir," the legislature has defined a "common reservoir" to be "all or any part of any oil or gas field or oil and gas field that comprises and includes any area that is underlaid or that, from geological or other scientific data or experiments or from drilling operations or other evidence, appears to be underlaid by a common pool or accumulation of oil or gas or oil and gas." Tex.Nat.Res.Code Ann. § 86.002(4) (Vernon 1988).

The term "horizon" refers to a plane of stratification assumed to have been once horizontal and continuous, or it may refer to a zone of a particular *formation,* such as the reservoir horizon, which is the portion of a formation that is of sufficient porosity and permeability to form a petroleum reservoir. H. Williams & C. Meyers, *Manual of Oil and Gas Terms* 442 (1987). A "producing horizon" is the same as a "pay horizon," meaning the geological deposit in which oil and gas is found in commercial paying quantities. *Id.* at 696. Once again, depending on the particular geological facts, the horizon or producing horizon may coincide with the whole reservoir or field, or the reservoir may have several distinct producing horizons. By using the term "stratum," which is a potentially smaller geological unit than field or reservoir, the legislature indicated its intent to limit the definition of "casinghead gas" to gas found in association with oil in an "oil stratum".[4]

Energy–Agri, however, also relies on a 1940 opinion in which the attorney general found the statutory definition of casinghead gas ambiguous and concluded:

> the term "casinghead gas" applies to all gas produced from any "oil well." ... Since ... the term "oil well" includes any well which produces one barrel or more of crude petroleum oil to each 100,000 cubic feet of natural gas, a well producing oil at a gas-oil ratio of 100,000 cubic feet of gas or less per barrel of oil would

be an "oil well," and under our construction of the term "casinghead gas," the gas from such well would be "casinghead gas"....

Op.Tex.Att'y Gen. No. 0–1760, at 3 (1940). As we have explained, the statutory definition of casinghead gas is not ambiguous. Because the intent of the legislature is apparent from the face of the statute, the attorney general opinion fails to adhere to the plain meaning rule. *See Cail v. Service Motors, Inc.* 660 S.W.2d 814, 815 (Tex. 1983); *Board of Land Comm'rs v. Weede,* Dallam 361, 361 (Tex.1840); *see also* Tex. Gov't Code Ann. § 311.011 (Vernon 1988). Furthermore, it is clear from the opinion that the attorney general did not address the case of a well's completion in more than one stratum, as we have in the present case. The ambiguity referred to in the attorney general opinion was whether the statutory definitions of "sweet gas" and "sour gas" also applied to "casinghead gas." Energy–Agri's reliance on the portion of the opinion quoted above is seriously misleading because it is taken out of the context of the opinion. The concluding sentence in the paragraph immediately preceding the definition Energy–Agri quotes states:

> On the other hand, the Legislature evidently considered that where gas is produced as a necessary incident to the production of oil from an oil well, the value of the oil produced would warrant the use of the casinghead gas "for any beneficial purpose." (Subsection 3, section 7, Article 6008).

*Id.* Thus the attorney general concluded that restrictions on the use of "sweet gas" and "sour gas" were not meant to apply to "casinghead gas." One reading the opinion in context could not reasonably conclude that it meant that gas produced from a perforation in a different stratum higher up the casing was casinghead gas solely because the well was classified as an oil well.

---

4. As noted above, in the simplest "cap rock" formation, gas would tend to collect in the upper strata, which would in that sense be "gas indigenous" strata of the formation. *See generally* 1 W. Summers, *The Law of Oil and Gas* § 4, at 9, 15 (1954).

In determining whether Energy–Agri is producing gas or casinghead gas from the Kimberlin wells, we must look at each completion in the brown dolomite and determine whether the production from that stratum, at that particular location, is sufficient to define it as an "oil stratum," i.e., a gas-oil ratio of 100,000 cubic feet of gas or less per barrel of oil. If it is an oil stratum, then the gas produced therefrom is casinghead gas. We have previously held that the statutes recognize "the possibility of a gas well and an oil well producing from different horizons of the same sand at different subsurface locations." *Bolton v. Coats*, 533 S.W.2d at 917. The fact that there is oil production sufficient for an oil well classification as to a location on a neighboring lease a significant distance away does not make the brown dolomite an "oil stratum" as to either of the Kimberlin wells. To be "casinghead gas," the statute requires that it be "produced from the stratum *with oil*." By that language the legislature meant gas "produced as a necessary incident to the production of oil." [5]

We hold that Energy–Agri owns only the oil right to "casinghead gas" as defined by statute. Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1978). When oil rights are severed from gas rights in a phase severance, and the parties do not otherwise specify in the conveying instrument, the party who owns the rights to casinghead gas owns only that gas or vapor which is indigenous to an oil stratum and is produced from that stratum along with oil, as contrasted to gas produced from a separate gas stratum through an oil well. Accordingly, Amarillo Oil is entitled to judgment quieting its title as against Energy–Agri to gas, other than casinghead gas as defined above, produced from the brown dolomite stratum through the Kimberlin numbers two and three wells.

### Jurisdiction

Energy–Agri claims that the trial court had no jurisdiction over the cause because it involves the classification of oil and gas wells, a matter within the exclusive jurisdiction of the Railroad Commission. Because classification of a well is a matter to be determined by the Commission, Energy–Agri argues that this suit is a collateral attack upon the Commission's classification. Energy–Agri, therefore, concludes that under the doctrine of primary jurisdiction, the district court lacked jurisdiction as Amarillo Oil did not first seek relief from the Commission. *See generally Gregg v. Delhi–Taylor Oil Corp.*, 162 Tex. 26, 29–31 & n. 5, 344 S.W.2d 411, 413–14 & n. 5 (1961); *Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W.2d 753, 755–56 (Tex.Civ.App.—Waco 1950, writ ref'd).

From the inception of its suit, Amarillo Oil has sought judgment quieting title to the gas from the brown dolomite formation. Energy–Agri advanced the position that either gas produced from a well classified as an oil well by the Railroad Commission was "casinghead gas" within the meaning of the conveyance as a matter of law, or the term was ambiguous and the evidence established such was the intended meaning. Amarillo Oil took the position that the Kimberlin wells could not possibly be classified as oil wells *as to the brown dolomite formation*. The trial court submitted Amarillo Oil's proposed charge, which consisted of six questions relating to such potential or hypothetical well classification. Because the issues submitted to the jury addressed whether the wells, if limited to the brown dolomite formation, met the statutory definition for oil wells, Energy–Agri argued, and the court of appeals agreed, that the whole suit amounted to an impermissible collateral attack on the Railroad Commission's classification. Such a limited view of the case cannot be reconciled with what this court has held concerning the Railroad Commission's primary jurisdiction.

This dispute has always been over the ownership of the gas being produced from

---

5. Op.Tex.Att'y Gen. No. 0–1760, at 3 (1940). We have borrowed the quoted language but applied it to a different provision and in a context slightly different from that addressed in the opinion.

the brown dolomite formation. The cause is properly within the jurisdiction of the courts because the Railroad Commission has no authority to determine title to land or property rights. *Railroad Comm'n v. City of Austin*, 524 S.W.2d 262, 267–68 (Tex.1975); *Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex.1965); *Nale v. Carroll*, 155 Tex. 555, 559, 289 S.W.2d 743, 745 (1956); *Ryan Consol. Petroleum Corp. v. Pickens*, 155 Tex. 221, 230, 285 S.W.2d 201, 207 (1955), *cert. denied*, 351 U.S. 933, 76 S.Ct. 790, 100 L.Ed. 1462 (1956); *Magnolia Petroleum Co. v. Railroad Comm'n*, 141 Tex. 96, 99–100, 170 S.W.2d 189, 191 (1943). Furthermore, even if the Railroad Commission had applied the statutory definition of casinghead gas which we hold to be determinative of Amarillo Oil's claims, it could not grant the injunctive and quiet title relief Amarillo Oil seeks.

We have addressed the issue of the Railroad Commission's primary jurisdiction on several occasions, and found it not to be so broad-sweeping as to oust the courts of jurisdiction just because the Commission might have jurisdiction to determine some facts related to the controversy. In *Gregg v. Delhi–Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411 (1961), we stated the rule that when an action is inherently judicial in nature, the courts retain jurisdiction to determine the controversy unless the legislature by valid statute has expressly granted exclusive jurisdiction to the administrative body. We therefore concluded that the Railroad Commission's primary jurisdiction did not prevent the courts from entertaining the suit to enjoin a trespass by the "sand fracking" technique, when it was alleged the cracks produced would extend into an adjacent owner's property, although the Commission would obviously have jurisdiction over the use of techniques to enhance production and protect correlative rights. In *Foree v. Crown Petroleum Corp.*, 431 S.W.2d 312, 316 (Tex.1968), we announced the further rule that the courts have jurisdiction when the Railroad Commission is powerless to grant the relief sought and to make incidental findings necessary to justify the relief. Thus we concluded the courts could entertain a suit for damages for violations of certain Commission rules and regulations, although the rules to protect correlative rights were within the jurisdiction of the Commission. We have further held that the courts have jurisdiction over a suit for damages from oil drainage alleged to be from overproduction by an adjacent mineral interest landowner who allegedly used false test data and information to get the Railroad Commission to set his allowable too high. *Zimmerman v. Texaco, Inc.*, 413 S.W.2d 387 (Tex.1967). We have further expressly approved an opinion and holding that the construction of an oil and gas lease is a matter for the courts, notwithstanding the involvement of the Railroad Commission's jurisdiction as to facts relating to production. *Biskamp v. General Crude Oil Co.*, 452 S.W.2d 515 (Tex.App.—San Antonio 1970, writ ref'd).

The present case involves title and property rights, the legal construction of a lease, and a claim of entitlement to an injunction. Consequently, the courts have jurisdiction over this suit notwithstanding the primary jurisdiction doctrine. We reverse the court of appeals' judgment which incorrectly dismissed this cause for want of jurisdiction.

### Evidence of "White Oil" Production

We have rejected the major premise on which the submission of the case to the jury was based. Casinghead gas must be produced with oil from an oil stratum. The question is not whether oil production from the brown dolomite was possible, but whether actual production or test results from the Kimberlin wells showed they would actually produce the required quantities of oil from that stratum. There was further error concerning the status of "white oil" production that should be avoided on retrial.

The trial court, over Energy–Agri's objection but as requested by Amarillo Oil, gave the jury a definition of oil that did not expressly include the so-called "white oil" produced by condensing gas into liquids by using low temperature extraction (LTX)

units.[6] The definition did not expressly state that LTX products were not included in "oil" production. The District Director for the Railroad Commission overseeing the Panhandle Field was allowed to testify, over objection by Amarillo Oil, that the Commission commonly included the LTX products in calculating the oil produced for well classification purposes. Other witnesses were also allowed to testify, over objection, that LTX products counted as "crude oil" for well classification purposes. At the time this case was tried, the practices of the Commission with respect to "white oil" were inconsistent and not based on court decisions construing the statute. Both the Railroad Commission and the courts have subsequently determined that the relevant Natural Resources Code provisions do not allow "white oil" to be counted as oil for well classification purposes. *Hufo Oils v. Railroad Commission,* 717 S.W.2d 405 (Tex.App.—Austin 1986, writ denied). Therefore LTX products also should be excluded from oil production to determine whether gas is produced from an "oil stratum." After excluding LTX production, the Kimberlin wells apparently would not even qualify as oil wells as to the granite wash formation.[7] On remand, the definitions, instructions, and evidentiary rulings should be consistent with what has now been settled—that LTX products are not "crude oil" for determining whether sufficient oil is produced to make the stratum an "oil stratum."

### Injunctive Relief

■ Although we agree that under the present record Amarillo Oil has established its title to the gas produced by Energy–Agri from the brown dolomite formation, we are unable to agree that Amarillo Oil is entitled to injunctive relief as a matter of law. In *Gregg v. Delhi–Taylor Oil Corp.* we held that the sand-fracturing technique that would extend cracks into adjacent landowners' property was a legal "trespass," but we noted that the Railroad Commission had not expressly approved the use of this technique at this well. In the subsequent case of *Railroad Commission v. Manziel,* 361 S.W.2d 560, 567–69 (Tex. 1962), we held that a salt water injection secondary recovery system expressly approved by the Railroad Commission did not amount to a "trespass," even though the salt water would physically invade the property of neighboring mineral interest owners. Later we described our holding in *Manziel* as a balancing of interests of the oil and gas industry as a whole against the interest of the individual operator, indicating our deference to the Railroad Commission's determinations on such competing factors. *Humble Oil and Refining Co. v. West,* 508 S.W.2d 812, 816 (Tex.1974). In *Railroad Commission v. City of Austin,* 524 S.W.2d 262, 280 (Tex.1975), we expressly recognized the right of the Railroad Commission to allocate the gas in the pipes during a gas shortage, even though the courts had exclusive jurisdiction to determine the dispute over contractual rights and actual ownership of the gas in the pipes.

We draw a distinction between the right of possession through the Railroad Commission-granted right to produce, and the right of ownership. In the present case the Railroad Commission expressly approved Energy–Agri's production of gas from the brown dolomite formation. That decision must be respected. But it does not mean Energy–Agri owned the gas. Amarillo Oil pursued an improper remedy

6. Many legal controversies involving the Panhandle Field arise from two practices by oil operators. One is the high perforations practice. Oil operators have been shooting perforations in the well casings into the gas formations, higher up in the hole. The second practice is producing white oil, which is accomplished by condensing gas into liquids by using low temperature extraction (LTX) units. For a more detailed discussion of white oil, see Dowling, *White Oil and Greenback Dollars: An Overview of Controversies Surrounding Production of*

*Gas from the Panhandle Field of Texas,* 19 St. Mary's L.J. 81, 84 & n. 7 (1987). The instant case presents the high perforations practice, but it also involves the white oil production practice through the production test results admitted in evidence.

7. The Railroad Commission classification was apparently based upon production of "white oil," which is not crude petroleum oil.

for its legal damage, but our reported cases did not resolve the conflicting lines of cases as to whether injunctive relief should be allowed. Also, the case was tried while the status of white oil production was unsettled, and its inclusion or exclusion from production for the calculation of damages was unclear.[8] Because we have clarified the law as to entitlement to injunctive relief, but the state of the record makes it impossible for us to render a just judgment as to damages in lieu of an injunction, we choose to remand this cause in the interest of justice on that issue. Tex.R.App.P. 180.

Our opinion today holds that Energy–Agri owns only the rights to oil and casinghead gas as defined by statute. We render judgment quieting title in Amarillo Oil to gas in the brown dolomite formation at the Kimberlin wells. How much, if any, of the gas removed from the Kimberlin numbers two and three wells has been casinghead gas, is a question of fact to be determined on remand. On remand Amarillo Oil will be limited to damages for its remedy, unless it shows the Railroad Commission has withdrawn its express approval of Energy–Agri's production of gas from the brown dolomite formation. Accordingly, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

Dissenting opinions by Justices GONZALEZ and MAUZY.

Justice HIGHTOWER not sitting.

MAUZY, Justice, dissenting.

I respectfully dissent. I cannot agree with the Court's decision to remand this cause to the trial court in the interest of justice. Amarillo Oil freely chose the legal theory, whether correct or incorrect, on which it proceeded at trial. It requested the questions submitted to the jury, it introduced evidence regarding those questions, and it received answers from the jury regarding those questions. Unfortunately for Amarillo Oil, the jury's answers were not favorable. Plainly, on the record before it, the trial court rendered a correct judgment. Such "an errorless judgment ... cannot be reversed in the interest of justice." *Uselton v. State*, 499 S.W.2d 92, 99 (Tex.1973). I would affirm the judgment of the trial court.

GONZALEZ, Justice, dissenting.

Today, the court 1) unwisely and improperly refuses to recognize the lawful authority of the Railroad Commission (RRC), 2) introduces a novel definition of "casinghead gas", and 3) reverses an errorless judgment. The court also remands the case for a trial on damages without any guidance whatsoever as to the proper measure of damages. This opinion will create uncertainty and chaos in the oil and gas industry and may discourage drilling. For these reasons, I dissent.

FACTS

Amarillo Oil is the owner of the *gas and gas rights* under a 61.42 acre tract of land. Energy–Agri is the owner of the *oil and casinghead gas and the oil and casinghead gas rights* under the same acreage. A well, now operated by Amarillo Oil, was completed in the Brown Dolomite Formation and has produced gas for more than thirty years. Energy–Agri later drilled its own well on the same tract, initially completing it in the deeper Granite Wash Formation.[1] In order to improve its perform-

8. By failing to submit a jury issue on the amount of damages, Amarillo Oil waived its claim for damages up to the date of judgment. Tex.R.Civ.P. 279. Amarillo Oil admits such in its response to the motion for rehearing in this cause.

1. There are five identifiable geologic rock formations in the Panhandle Field, including the Brown Dolomite and the Granite Wash Formations. They are interconnected and communicate at various points in the field. *Final Order*

*Adopting and Clarifying Rules and Regulations for the Panhandle Fields*, Finding of Fact No. 11, Tex.R.R. Comm'n, Oil and Gas Div., Docket No. 10–87,017 (Jan. 9, 1990). Evidence at trial demonstrated that the tract in controversy consists of only three formations. The Brown Dolomite Formation is the uppermost formation, followed by the Granite Wash and the Granite Formations. Fractures in the shale below the Brown Dolomite permit the free passage of hydrocarbons in and out of the formations.

ance, Energy–Agri perforated the well at the same depth from which the Amarillo Oil gas well produces. This well, the Kimberlin # 2, was perforated before trial. Energy–Agri drilled another well, the Kimberlin # 3, and planned to perforate it in the same manner.

The parties dispute whether the substance extracted as a result of the perforations is "gas" or "casinghead gas". Amarillo Oil filed suit to quiet title and alleged that Energy–Agri was converting its gas; it also requested an injunction, an accounting, and damages.

The trial court granted a temporary injunction against Energy–Agri and permitted a test to be made in the presence of RRC staff to determine if the Energy–Agri wells should be classified as "oil" or "gas" wells. Following the test, the RRC did not change its previous classification of the wells as "oil" wells.

Thereafter, a trial ensued, and the jury answered questions favorably to Energy–Agri. *Specifically, the jury found that the Brown Dolomite can produce oil, that it is not a horizon productive of gas only, and that Energy–Agri's wells are capable of producing oil.* Amarillo Oil did not present any evidence on alleged damages, request any questions on damages, or request a new trial to determine damages.

Based on the jury findings, the trial court rendered a take-nothing judgment against Amarillo Oil and dissolved the temporary injunction. The court of appeals dismissed the case, holding that Amarillo Oil's title claims constitute an impermissible collateral attack upon the Railroad Commission's orders classifying the wells as oil wells over which the district court lacks jurisdiction.

## RRC CLASSIFICATION ENTITLED TO GREAT DEFERENCE

I agree with the court that the statutory definition of casinghead gas is the appropriate definition to apply in this case. However, I disagree with the court's conclusion that the statutory definition is unambiguous. In my opinion, the definition of casinghead gas is ambiguous and we should look to the RRC interpretations. The RRC has been charged by the legislature to apply the statutory definition of casinghead gas. Tex.Nat.Res.Code Ann. § 86.041 (Vernon 1978); *see also Gulf Land Co. v. Atlantic Refining Co.*, 131 S.W.2d 73, 81 (Tex.1939) (RRC is given power and duty to make rules and orders to effectuate aims and purposes of statute). The RRC applied this definition in classifying the wells in question. Amarillo Oil has not properly challenged the construction or application of this definition by the RRC in this case as being erroneous or unsound. Thus, the court should give the RRC's classification great weight and deference.

Courts give great weight to long standing construction of statutes by the RRC. *Deep South Oil Co. v. Texas Gas Corp.*, 328 S.W.2d 897, 903 (Tex.Civ.App.—Beaumont 1959, writ ref'd n.r.e.); *see also Franklin Fire Ins. Co. v. Hall*, 247 S.W. 822, 823 (Tex.1923). Especially when interpreting an ambiguous or uncertain statute, the "proper course is to follow the departmental construction, unless that interpretation is clearly erroneous or unsound." *Shaw v. Strong*, 96 S.W.2d 276, 281 (Tex. 1936) (Cureton, C.J., concurring); *see also Ex parte Roloff*, 510 S.W.2d 913, 915 (Tex. 1974). The only way to attack a RRC determination is through the judicial review process outlined in the Natural Resources Code. *See* Tex.Nat.Res.Code Ann. § 86.225. This has not been done, and the RRC's conclusion that the substance in question is casinghead gas should therefore stand.

The question of what is "gas", "casinghead gas", and "oil" is complicated because hydrocarbons exist in either a liquid or vapor phase or in a mixed vapor or liquid phase depending on temperature, pressure, and chemical composition. If any one of these variables is altered, a portion of oil may become a gas and vice versa. The time and place of inquiry are also critical variables. Whether a substance is oil or gas depends on whether it is located in the reservoir, the wellbore, or after separation. Hydrocarbons may change from a gas to a liquid or vice versa in each of these loca-

tions. *See* Note, *Phase Severance of Gas Rights From Oil Rights,* 63 Tex.L.Rev. 133 (1984).

The application of the definition of casinghead gas requires technical expertise, and the legislature has provided that the RRC maintain such experts on its staff. *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411, 413 (1961). For this reason, it makes more sense for the RRC to make the determination of what is "oil" and what is "gas" or "casinghead gas." [2]

The court would allow individual juries to determine (in a sense make classifications) whether a substance being extracted is "oil", "gas", or "casinghead gas". This ad hoc approach extends to potentially thousands of leases [3] and will create uncertainty and chaos in the oil and gas industry, which will likely discourage drilling.[4] Juries will be charged with interpreting and applying the same definition as the RRC is charged by the legislature with applying. Juries will also consider the same evidence as the RRC. Our already overburdened court system will in all likelihood be inundated with these types of cases, and different juries faced with identical evidence on adjoining tracts may reach different results. After today, even though the RRC classifies wells as "oil" wells or "gas" wells and issues permits accordingly, operators may not exercise their rights under the permits out of fear of litigation and inconsistent jury verdicts.[5] Adherence to the RRC determinations leads to consistency and orderly development of the State's oil and gas reserves—this the court sacrifices. As I have previously stated, the RRC's determination of what is "gas" or "casinghead gas" is not the last word. Parties dissatisfied with the RRC's classification have the right to judicial review as outlined in the Natural Resources Code.

## A NEW DEFINITION OF CASINGHEAD GAS

The court arrives at a new definition of casinghead gas by concluding that the statute is unambiguous and reading together the statutory definitions of "casinghead gas" and "oil well". Maj. opinion page 22.

Casinghead gas is statutorily defined as "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil." Tex.Nat.Res.Code Ann. § 86.002(10). The court today rewrites this definition by inappropriately equating "stratum" with "oil well". An oil well is defined as "any well that produces one barrel or more of oil to each 100,000 cubic feet of gas." Tex.Nat.Res.Code Ann. § 86.002(6). The end result of the court's new definition is that a stratum must produce at least one barrel of oil for each 100,000 cubic feet of gas in order to be an oil stratum. This is an unorthodox view, and I am surprised that the court attempts to justify its decision by merely stating "the intent of the legislature is apparent from the face of the statute." Maj. opinion page 24. There is absolutely no authority for equating a stratum with an oil well. In my opinion, the definition of "casinghead gas" is ambiguous, and the RRC has

---

2. The court erroneously assumes a controverted fact when it says in its introductory paragraph: "At issue ... is the ownership of *gas* produced from two wells...." Maj. opinion page 21 (emphasis added). The whole lawsuit is a controversy over whether the substance being extracted by Energy–Agri is "gas" or "casinghead gas" and the court improperly settles the issue by the way it frames the question.

3. *According to the* RRC, more than 15,000 oil and gas wells have been assigned the same surface acreage. *Final Order Adopting and Clarifying Rules and Regulations for the Panhandle Fields,* Finding of Fact No. 21, Tex.R.R. Comm'n, Docket 10–87,017 (Jan. 9, 1990).

4. To understand the chaos and uncertainty, compare this case to *Dorchester Gas Producing Co. v. Harlow Corp.,* 743 S.W.2d 243 (Tex.App.—Amarillo 1987, writ dism'd by agr.), and *Raw Hide Oil & Gas Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264 (Tex.App.—Amarillo 1988, writ denied). In the present case, the jury found the Brown Dolomite Formation was capable of producing up to 6 barrels of oil per day, while the juries in *Dorchester* and *Raw Hide* found the Brown Dolomite Formation not capable of producing oil at all.

5. This will be especially true until the measure of damages is resolved. At the very least, the court should minimize the chaos it creates today by spelling out recoverable damages.

construed this definition for over half a century. If the legislature was dissatisfied with this construction, they would have changed it by now. Rather than mucking up the definition of casinghead gas, the court should follow the RRC's construction.

The legislature clearly applied the 100,-000:1 gas oil ratio (GOR) only to an entire well's production, as opposed to each individual stratum from which the well produces. Section 86.043 of the Texas Natural Resources Code authorizes the RRC to "fix and determine the gas-oil ratio of all *wells* in the state" (emphasis added) without mentioning any determination of the gas-oil ratio for individual strata. Neither the legislature nor the RRC have made provisions for calculating a GOR for strata.

Moreover, before today, oil wells could produce from strata which individually produce at more than a 100,000:1 GOR and produce from other strata that produce at less than a 100,000:1 GOR, so long as total production from the entire well met the 100,000:1 GOR. *See* Tex.Nat.Res.Code Ann. §§ 86.002(10) and 86.097 (Vernon 1978). This practice will have to cease; according to the court's new definition of casinghead gas, the only way an oil well will actually produce at the 100,000:1 GOR permitted by statute is if all strata also produce at a 100,000:1 GOR. If any strata produce at more than a 100,000:1 GOR, production will be violative of the new definition. If any strata produce at less than 100,000:1 GOR, the well's GOR will be less than 100,000:1 because no strata greater than 100,000:1 will be allowed to offset it.[6] If the legislature had intended this construction of these statutes, they would have said so. Instead, the legislature, in the "protection of public and private inter-ests," granted the RRC "broad discretion in administering the provisions of this chapter...." Tex.Nat.Res.Code Ann. §§ 86.-001, 86.041.

I am not suggesting that Energy–Agri's oil wells should be entitled to draw from horizons which produce only gas. This is impermissible. *See* Tex.Nat.Res.Code Ann. § 86.097 ("No person ... operating an oil well may produce from the oil well gas found in a horizon productive of gas only.").

## RENDITION OF JUDGMENT QUIETING TITLE

I am further puzzled by the court's action in rendering judgment for Amarillo Oil quieting title to all gas in the Brown Dolomite Formation at the Kimberlin wells. Amarillo Oil chose the legal theories under which it brought this lawsuit; it requested all of the questions that the trial court submitted to the jury and the jury answered them unfavorably to Amarillo Oil. Specifically, the jury determined that the Brown Dolomite Formation can produce crude petroleum oil.

In light of the adverse jury findings, the only way the court can justify its decision is by concluding Amarillo Oil has established its case as a matter of law. We must conclude that, under all the evidence, the Brown Dolomite Formation unequivocally *cannot* produce oil. In reviewing the evidence, we must consider it in the light most favorable to the verdict.

The only evidence the court discusses is evidence pertaining to "white oil" produc-

---

**6.** The statutory definition requires the gas be indigenous to an oil stratum. Nowhere in the statute is the term "stratum" defined. The term "stratum" likely contemplates a formation or group of formations not in communication with other formations. Otherwise, production from one stratum will affect the conditions in the other strata which determine title. At best, it is unclear from the statutory definition of casinghead gas whether the five formations of the Panhandle Field which are in communication with each other should be treated as a single stratum.

The court also equates stratum with formation. The court notes that a formation is "[a] succession of sedimentary beds that were deposited continuously and under the same general conditions." Maj. opinion page 23 n. 3. According to this definition, a formation may be identified in a number of wells. Therefore, the court's GOR requirement would seem to apply to all production from the formation, not just production from a single well; yet the court, with no apparent rationale, applies the GOR test for stratum to a particular location.

tion.[7] The court concludes that if "white oil" production had been excluded, Energy–Agri's wells "apparently" would not even qualify as oil wells. The court ignores the evidence of R.L. Vogt, a professional chemist with many years of experience analyzing hydrocarbons in the Panhandle Field. Vogt testified that the substance coming out of Energy–Agri's wells was not white oil because white oil is water clear and the substance coming out of the well was a light straw color. According to Vogt, a substantial portion of the hydrocarbons produced through the LTX unit were originally in the form of crude oil in the reservoir, and that liquid "is in fact a portion of the crude oil and is crude oil." Nor does the court address Energy–Agri's complaints about the circumstances under which the test was performed. Eight to nine pounds of back pressure were kept on the well during the tests; this depresses the oil level in the wellbore by as much as three feet for each pound of pressure. According to Energy–Agri's evidence, had the test been conducted under actual operating conditions and without the back pressure impeding the flow of liquids into the wellbore, the oil production would have been greater. Dan Michael, an independent consulting geologist, testified that a well, when operated properly, can produce oil and casinghead gas from the Brown Dolomite Formation.

Other evidence showed that even Amarillo Oil's gas well produced crude petroleum oil. Jerry Bennett, general manager of Medallion Equipment Company, leased a compressor unit to Amarillo Oil. On two occasions, he visited the well site to work on the compressor and on both occasions he discovered oil in the scrubber unit of the well. On one occasion, he found several gallons of oil. Bennett firmly stated that the oil was crude oil and not lubricating oil for the compressor.

Other experts testified that vertical fractures in the shale below the Brown Dolomite permit the free passage of hydrocarbons in and out of the Brown Dolomite. This communication between formations makes oil production from the Brown Dolomite possible. At least three other witnesses testified that the Brown Dolomite produces large quantities of oil in parts of the Panhandle Field close to the tract in question. Just to the north of the tract in controversy, over 42,000 barrels of crude oil has been produced from wells perforated in the Brown Dolomite.

This evidence demonstrates that the Brown Dolomite may produce oil. Thus, it is ridiculous to say, as the court has done, that as a matter of law, Amarillo Oil has conclusively proven otherwise. If the court must persist in its conclusion, it should at least apply the proper standard of review and explain why Energy–Agri's evidence is not some evidence to support the jury verdict.

### DAMAGES

I am further disturbed by the fact that the court gives Amarillo Oil another bite at the apple on the issue of damages by remanding this case in the interest of justice. At trial, Amarillo Oil sought damages for an accounting and for conversion, but as the court acknowledges, these claims were *waived* when Amarillo Oil did not request jury questions on these claims. Tex.R. Civ.P. 279; *Washington v. Reliable Life Ins. Co.*, 581 S.W.2d 153, 156 (Tex.1979). Nonetheless, the court remands this cause for a determination of damages. To support its decision to send this case back to the trial court, the court claims to have found error in the judgment of the trial court. Maj. opinion page 21. The court,

---

7. This evidence is irrelevant. The trial court's instructions to the jury excluded white oil production from calculation of crude oil production. Specifically, crude oil was defined as "any liquid hydro-carbon mixture or portion thereof ... which is in a liquid phase in the reservoir ... and obtained at the surface as such and which is not *the result of condensation of gas* before or after it leaves the reservoir." (empha-

sis added). This excludes white oil, which is gas obtained in a liquified form as a result of condensation. The jury determined that, excluding white oil production, the Brown Dolomite can produce six barrels of oil through Energy–Agri's wells. I believe that there is some evidence to support this finding. Furthermore, the court presumes that the jury disobeyed this instruction.

however, does not favor us with an explanation of the alleged error.

I do not believe the trial court committed an error. Energy–Agri should not be penalized for the strategic decision Amarillo Oil made when it abandoned its claim for damages. The court's action gives Amarillo Oil an opportunity to revive claims it once deserted and improperly permits a losing party to have a new trial. *Uselton v. State,* 499 S.W.2d 92, 99 (Tex.1973).[8] The better practice would be for Amarillo Oil to file a new claim.

Finally, I am troubled by the court's statement that "Amarillo Oil pursued an improper remedy for its legal damage". Maj. opinion page 27–28. The court's failure to tell the parties what measure of damages is recoverable will only add to the confusion and invite further litigation.

For all of these reasons, I dissent.

---

8. To relitigate the issues of damages and conversion comes close to offending the policy reasons supporting the doctrine of collateral estoppel.