**RAILROAD COMMISSION of Texas and Russell Maguire, Appellants,**

**v.**

**RIO GRANDE VALLEY GAS COMPANY, Appellee.**

No. A–11029.

Supreme Court of Texas.

June 22, 1966.

Rehearing Denied July 27, 1966.

Dissenting Opinion Filed July 27, 1966.

Dee J. Kelly, Fort Worth, Linward Shivers, Asst. Atty. Gen., Austin, for appellants.

Black & Stayton, Austin, for appellee.

NORVELL, Justice.

The question involved upon this appeal is whether a Railroad Commission ratable take order dated March 6, 1965 relating to the West Port Isabel Gas Field, Cameron County, Texas, is authorized by the Texas Common Purchaser Act, Article 6049a, 1. c. §§ 8 and 8a, Vernon's Ann.Tex.Stats.

The order required Rio Grande Valley Gas Company to "extend its gathering line to the Russell Maguire Well No. 1, Yturria Lease, and to connect said well and to take gas therefrom without unjust or unreasonable discrimination in favor of its own production or that of any other producer in said field area and without unjust or unreasonable discrimination as between the separate reservoirs making up West Port Isabel Field area so that the said Russell Maguire or any other party owning an interest in the Yturria Lease will be afforded an opportunity to produce and sell his ratable share of the total market outlet for all of said reservoirs making up said field area".

Rio Grande Valley Gas Company attacked the order of the Commission in the District Court of Travis County, Texas, and by decree dated August 12, 1965, that Court declared that such order was invalid and permanently enjoined the Railroad Commission from enforcing or attempting to enforce the same. The Railroad Commission joined by Russell Maguire prosecuted a direct appeal to this Court.

We reverse the judgment of the District Court and vacate the injunction decree.

The central problem in this case encompasses three questions:

1. Has the Railroad Commission the authority to compel a common purchaser pipeline company to purchase gas produced from a reservoir from which such company is taking no gas? The "West Port Isabel Field" is a multiple reservoir area and Rio Grande is taking from some reservoirs and not from others.

2. Under the circumstances disclosed by the record, does the Common Purchaser Act empower the Commission to order Rio Grande to extend its facilities to connect with the Maguire well?

3. Is the Commission's order fatally defective because it does not purport to fix the terms upon which Rio Grande is to purchase gas from Maguire No. 1 well in view of the fact that appellant and appellee have not agreed to any terms?

We will discuss these questions in the order stated. However, in order to make clear our holding with reference thereto it is necessary to state in some detail the physical facts relating to the West Port Isabel Field and the drilling operations had therein. Such field or area embraces seven vertically separated gas reservoirs. Three producing wells have been drilled in the field. The first well was drilled by Texas Gulf Producing Company and is a single completion in the 7300' reservoir. The second well was drilled by Rio Grande and is a quadruple completion in the 7300', 7500', 8350' and 8850' reservoirs. It was originally completed in 1963 as a triple completion in the 6850', 8350' and 8850' reservoirs but in 1964, after the 6850' reservoir had been depleted, the present quadruple completion was made. The third well was drilled by appellant, Russell Maguire, and was dually completed in the 7700' and 8100' reservoirs. The acreage of the leaseholds involved is as follows: Texas Gulf: 80 acres; Rio Grande: 845.38 acres; and Maguire: 7189.25 acres.

Rio Grande, in addition to being a producer of gas, owns and operates a wholly intrastate pipeline system in the field area. It purchases, transports and sells gas for domestic use in the Lower Rio Grande Valley of Texas and is designated as a public gas utility in its articles of incorporation.

There are three different sizes of pipeline installations operated by Rio Grande in the field area: (1) a six inch transmission line running east from the City of Port Isabel through the town of Los Fresnos; (2) an eight inch line which runs from the north through a measuring station located on State Highway 100 and continues generally southwest to a point northeast of the Port of Brownsville and thence to the

City of Brownsville; and (3) a pipeline approximately 6447 feet long made up of three and four inch diameter pipes running from Rio Grande's well to the Highway 100 Measuring Station. The subjoined plat taken from a brief on file herein shows the

location of the Highway 100 Station and the existing three and four inch line running from the Rio Grande well to the measuring station. The double dash line indicates the extension to the Maguire well ordered by the Commission. The single dash line indicates the course a connecting line would take between the Maguire well and the

station by going around the segment of land referred to as the Garcia tract over which Maguire has been unable to obtain a right of way.

On July 30, 1957, Rio Grande and Texas Gulf Producing Company entered into a gas purchase contract. By this contract, Texas Gulf dedicated the gas reserves beneath its Garcia lease in the West Port Isabel Field, together with large gas reserves in a separate field known as the Vista del Mar. The contract fixes the point of delivery for Texas Gulf's gas at Rio Grande's Highway 100 Measuring Station. As required by the gas purchase contract, Texas Gulf at its own expense laid a gathering line from its well to the Highway 100 Station. (This pipeline is not shown on the above plat.) At the time Texas Gulf laid its gathering line, Rio Grande's three and four inch line, 6647 feet in length, had not been constructed but was thereafter laid to the Rio Grande well. Although Rio Grande refers to this latter line as a "gathering" line, it appears that in its reports to the Railroad Commission's Gas Utility Division, Rio Grande showed this pipeline to be a part of the facilities included in its rate base. The cost thereof is consequently reflected in the rate Rio Grande charges its customers.

Under the Texas Gulf contract, Rio Grande obligated itself to pay 13.9 cents per mcf for all gas taken from the Texas Gulf well from and after May 1, 1965. The 13.9 cents per mcf is also used in calculating the royalty payments made by Rio Grande out of the production taken from its well.

On October 1, 1964, Rio Grande and Sinclair Oil & Refining Company (Texas Gulf's successor) executed an agreement whereby Rio Grande acquired 85% of the production and all field equipment formerly owned by Texas Gulf in the West Port Isabel Field. Conversely, Sinclair acquired a 15% interest in Rio Grande's equipment and production in the field. The Maguire well remained the only one in the field without a connection to the pipeline controlled by Rio Grande and Sinclair, both of which are gas producers. It further appears that except for the Rio Grande pipeline, there was no gas market available within seventeen miles of the West Port Isabel Field.

The Railroad Commission found that appellee, Rio Grande Valley Gas Company, is a common purchaser and public gas utility and that a reasonable extension of its facilities was necessary to prevent unjust and unreasonable discrimination. The operative part of the order entered by the Railroad Commission has been heretofore set out.

Article 6049a, § 8 (made applicable to gas by Article 6049a, § 8a) provides in part that a common purchaser of gas, "shall purchase gas offered to it for purchase without discrimination in favor of one producer or person as against another in the same field, and without unjust or unreasonable discrimination as between fields in this state; taking into consideration the production and age of wells in respective fields and all other proper factors. * * "[1]

---

**1.** The complete text of Article 6049a, §§ 8 and 8a is as follows:

"Sec. 8. Every person, association of persons or corporation who purchases crude oil or petroleum in this State, which is affiliated through stock-ownership, common control, contract, or otherwise, with a common carrier by pipe line, as defined by law, or is itself such common carrier, shall be a common purchaser of such crude petroleum and shall purchase oil offered it for purchase without discrimination in favor of one producer or person as against another in the same field, and without unjust or unreason-

able discrimination as between fields in this State; the question of justice or reasonableness to be determined by the Railroad Commission, taking into consideration the production and age of wells in respective fields and all other proper factors. It shall be unlawful for any such common purchaser to discriminate between or against crude oil or petroleum of a similar kind or quality in favor of its own production, or production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the purchase of crude oil or petroleum to be marketed,

The word "field" as used in the oil industry has a meaning which is usually determined from the context in which it is used. It may refer to a certain geographical area from which oil is produced or it may be restricted to a particular reservoir. If the term "field" be construed as embracing the seven reservoirs lying above or below each other, then Rio Grande is producing from the West Port Isabel Field with well completions at the 7300', 7500', 8350' and 8850' levels. On the other hand, if the word "field" as used in the statutory phrase "without discrimination in favor of one producer or person as against another in the same field" be restricted to reservoirs, then Rio Grande is not producing from the same field as Maguire whose well was completed at the 7700' and 8100' levels.

It is conceded by the appellants that the Commission for proration purposes is required to classify a common reservoir as a separate field. See, Benz-Stoddard v. Aluminum Company of America, 368 S.W.2d 94 (Tex.Sup.1963).[2]

However, we are here dealing with discrimination and monopolistic practices. The emergency clause of the original Common Purchaser Act (relating to oil) recited that: "The fact * * * that no law of this State regulates the business of purchasing crude petroleum, and that there is existing discrimination and virtual monopoly in such business, constitutes an emergency and imperative public necessity * * *." Acts 1930, 41st Leg., 5th C.S., ch. 36, p. 171.

Likewise, the emergency clause of the Act which contained the gas amendments to the Common Purchaser Act refers to discrimination in the following terms: "The fact that (the 1930 Act) * * * did not include the common purchasing of natural gas and that there is existing discrimination in the purchase of oil and gas, creating chaos in the industry, constitutes an emergency and an imperative public necessity, * * *" Acts 1931, 42nd Leg., 1st C.S., ch. 28, p. 58.

It was shown by evidence that in 1930 and 1931 when the Common Purchaser Acts were passed, the technique of multiple completion of gas wells was unknown. It was also shown that the Railroad Commission as a matter of administrative practice and interpretation has always considered that the word "field" as used in the phrase, "shall purchase without discrimination in favor of one producer or person as against another in the same field", referred to a geographical area containing one or more overlying common reservoirs, and the Attorney General so ruled in 1939 (Op. 0–1103).

such production shall be taken in like manner as that of any other person or producer and shall be taken in the ratable proportion that such production bears to the total production offered for market in such field. The Railroad Commission of Texas shall have authority, however, to relieve any such common purchaser, after due notice and hearing as hereinafter provided, from the duty of purchasing petroleum of inferior quality or grade."

"Sec. 8a. That in order to further conserve the natural gas resources of this State every person, association of persons, joint stock company, limited co-partnership, partnership, corporation, gas pipe line company or gas purchaser now, or hereafter, claiming or exercising the right to carry or transport natural gas by pipe line, or pipe lines, for hire, compensation or otherwise within the limits of this State, or which is now engaged or shall hereafter engage in the business of purchasing, or taking, natural gas, or residue gas or casinghead gas shall be a common purchaser thereof, and shall purchase, or take, such gas under such rules or regulations as may be prescribed by the Commission, in the same manner, under the same inhibitions against discriminations and subject to the same provisions as are herein set out with respect to common purchasers of oil."

2. Article 6049d, Vernon's Ann.Tex.Stats., relating to the allocation of the production of gas from a common source of supply defines the words, "pool", "common pool", "field", and "common source of supply" as meaning a common reservoir. (Section 10)

The overall general purpose of the common purchaser legislation is abundantly clear. Advances in well drilling techniques such as the development of the multiple completion of gas wells, which may not have been foreseen by the Legislature, should not be allowed to defeat such purpose. Maguire is now producing from the 7700' and 8100' reservoirs and as found by the Commission, "the Rio Grande well has both reservoirs behind the pipe that are found in the Maguire well, but that no gas is being produced from such reservoirs". To construe the Act as having the limited application urged by the appellee would practically destroy its effectiveness as an anti-discriminatory measure so far as vertically separated multiple reservoirs are concerned. A common purchaser could readily avoid the statutory imposed ratable take obligation simply by bypassing and not completing a well in any reservoir which then was producing from a completed well owned by another person or entity.

■ We hold that Maguire and Rio Grande are producers "in the same field" despite the circumstance that their respective wells are producing from different vertically separated reservoirs, and that accordingly, Maguire is entitled to the protection and benefits of the Common Purchaser Act. See, Railroad Commission of Texas v. Permian Basin Pipeline Company, 302 S.W.2d 238 (Tex.Civ.App.1957, ref. n. r. e.). Gilbert I. Low, Common Purchasers of Oil and Gas, 39 Tex.L. Review 84 (1960).

We pass to the second question above stated relating to the legality of that portion of the order requiring Rio Grande to extend its pipeline facilities to connect with the Maguire well. In connection therewith, the Commission made the following fact finding which is reasonably supported by substantial evidence, viz.:

"The activities of Rio Grande Valley Gas Company establishes it as a common purchaser and public gas utility serving in the West Port Isabel Field area;

that a reasonable extension of its gathering line to the Maguire Well No. 1, Yturria Lease as prayed for in the application of the said Maguire, is reasonably necessary to prevent unjust and unreasonable discrimination; that such extension is reasonable and required in the public interest; that the expense involved will not impair the ability of Rio Grande to perform its duties to the public;"

The statutory basis for this finding and the order based thereon is Article 6049a, §§ 8b and 11d, which read as follows:

Section 8b: "It shall be the duty of the Railroad Commission of Texas to see that the provisions of this Act are fully complied with, and it shall have the power, after notice and hearing, to make rules, regulations and orders, defining the distance that extensions or gathering lines shall be made to all oil or gas wells; and such other rules, regulations or orders as may be necessary to carry out the provisions of this Act, and to prevent discrimination in purchases."

Section 11d: "The Railroad Commission shall make inquiry in each field concerning the connections of the various producers and when discrimination is found to be practiced by any common purchaser as defined in this Act the said Railroad Commission shall issue an order to such common purchaser to make such reasonable extensions of their lines and such reasonable connections as will prevent such discrimination."

Rio Grande's primary argument is based upon its assertion that each of the overlying reservoirs in the West Port Isabel Field area is to be considered as a separate field and as it is not producing from the reservoirs in which the Maguire well has been completed, it cannot be lawfully ordered to extend its lines to serve a reservoir or "field" from which it is taking no gas. For the reasons hereto-

fore stated, we hold that this position is not well taken.

■ Rio Grande also contends that the extension ordered by the Commission is unauthorized because it requires a connection with the three and four inch pipeline constructed by Rio Grande to connect with the well drilled and owned by it. It is said that the purpose of this line is essentially private and that the order of the Commission requiring it to transport gas from Maguire's well by use of this line will deprive Rio Grande of "flexibility" in operation now allowed to it by a single connection to its own well. This flexibility is said to be highly important because of an extreme variation in load factors occasioned by the usual inconsistent weather which prevails in the Lower Rio Grande Valley (served by appellee) during the winter season. It appears, however, from evidence introduced upon the trial that the existing line, 6447 feet in length, running from the Rio Grande well to the Highway 100 Station, has a carrying capacity of seventeen million cubic feet per day and that its average daily load is approximately one-half of full capacity. The Commission could well conclude that the line would not be taxed beyond capacity by carrying the ratable take from Maguire's well. Further, as has been pointed out, this particular gas line has been reported as a portion of Rio Grande's rate structure by which the amounts charged to its customers are determined. An extension of such line could also be so reported. The statute speaks of "reasonable extensions" and "reasonable connections" in order to prevent discrimination. Article 6049a, § 11d. The Common Purchaser Act vested the Railroad Commission with wide and extensive regulatory power to accomplish the objectives of the Act. Article 6049a, § 9. Further orders may become essential by reason of changing conditions in the West Port Isabel Field and the population growth of the area served by Rio Grande as a public utility. However, it cannot now be said that an order requiring an extension of Rio Grande's lines is either illegal or unreasonable.

■ In contending that the order of the Railroad Commission is fatally defective, Rio Grande asserts that such order does not with sufficient certainty inform appellee as to the price it shall pay appellant for his gas or as to the quantity of gas appellee is to take from appellant's well. The provisions of the order follow the statute. Neither price nor quantity of take are prescribed. This does not mean that such factors may not be ascertained. The Commission directed Rio Grande to connect the Maguire well with its pipeline system and "take gas therefrom without unjust or unreasonable discrimination in favor of its own production or that of any other producer in the field and without unjust or unreasonable discrimination as between the separate reservoirs making up the West Port Isabel Field area * * *".

Rather extensive discussions relating to gas prices at the wellhead are contained in the briefs. Rio Grande argues that there is a substantial difference in the way gas prices are established as compared to oil prices which are usually controlled by the posted field price per barrel of oil. It is said that the price per mcf of gas is generally determined by private treaty between purchaser and seller containing numerous provisions relating to quality of gas, processing, dedicated reserves and the like.[3] It is pointed out that in its contract with Texas Gulf, Rio Grande acquired dedicated reserves in the Vista del Mar field which is a separate field from the West Port Isabel Field, and that the con-

---

3. Appellee calls attention to a paper by D. H. Gregg discussing the negotiation and drafting of gas purchase contracts in which some twenty problems of drafting are discussed. The matter of price is in turn divided into eight sub-heads. 13th Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation, p. 87.

necting line between the Texas Gulf well and the Highway 100 measuring station had been laid by Texas Gulf. It is said that all these factors entered into the price agreed upon per mcf, which under the terms of the contract rose from 12.5 to 13.9 cents per mcf on May 1, 1965, eight years after the contract was signed.

There is also a record of negotiation between Rio Grande and Maguire as to price and the construction of a line connecting the Maguire well with the Rio Grande pipeline system. Rio Grande insisted that Maguire build its own connection to the Highway 100 measuring station and then offered to take only 200 mcf per day at 13 cents per mcf.

On the other hand, it appears that the price of 13.9 cents per mcf is the only price paid for gas in the West Port Isabel Field area. It is the price specified in the Texas Gulf contract and more important, it is the price basis upon which Rio Grande accounts to its royalty holders. It further appears that there is no substantial difference in the quality of gas produced from any of the several reservoirs in the field or area.

Ordinarily, the question of price is one to be settled by agreement of the parties, and it is not the function of the Commission primarily to set a wellhead price per mcf. The same may also be said as to the amount of gas to be taken from any particular purchaser. However, in the absence of agreement as to these items, it then becomes the primary duty of the common purchaser to devise in good faith a formula, which will be non-discriminatory as to price and ratable take among the various producers in the field. While ratable take is generally based upon a well's allowable, this is not necessarily true in all cases. Where no allowable has been set, another reasonable basis may be selected. Deep South Oil Company of Texas v. Texas Gas Corporation, 328 S.W. 2d 897 (Tex.Civ.App.1959, ref. n. r. e.). Once the common purchaser has in the absence of agreement set a price, the question of the good faith of the purchaser and the reasonableness of the bases chosen by it in setting the price may present a question for the Railroad Commission. Primarily, what the order of the Commission does in this case is to determine that Rio Grande is a common purchaser and that as such it must take gas from the Maguire well in accordance with the statutory provisions proscribing discrimination. The order adopted by the Commission is in proper form to meet the situation as it has so far developed. It remains to be seen whether further or additional orders will be required. A failure to agree when there is a dispute concerning the legal rights of the parties does not necessarily mean that they will continue to disagree when such rights have been settled. Here, the Commission has determined that Rio Grande must extend its lines to connect with Maguire's well and take his gas without discrimination. We approve these holdings. It is not to be anticipated that hereafter no agreements will be made by the parties or that in the absence of agreement, the common purchaser will adopt an unreasonable plan for ascertaining the price to be paid and the quantity of gas to be taken.

Accordingly, the judgment of the District Court is reversed and the injunction issued by that Court is dissolved. Judgment is here rendered that appellee, Rio Grande Valley Gas Company, take nothing against appellants, Railroad Commission of Texas and Russell Maguire.

### DISSENTING OPINION

GREENHILL, Justice.

As I understand the record in this case, no waste of oil or gas or protection of correlative rights are involved. No other producer is taking gas from the particular strata involved. While I could agree that the gas well was "in the same field" with other nearby wells producing from different horizons, I am unable to find any statu-

tory authority authorizing the Railroad Commission to fix the price of gas where the producer and the pipeline company cannot agree upon a price.

Where oil is involved, there is frequently a posted price for the oil in the field; and it is not unreasonable to require the pipeline company to take the oil from the same field at the uniform "posted price." So far as I know, however, there is no posted price for gas, and the price to be paid for gas has been the subject of private contract.

Perhaps it is desirable for the Commission to have this power; and perhaps it would be desirable for the Texas Railroad Commission to have the power to deal with these intrastate matters as the Interstate Commerce Commission has in interstate transactions. But the Railroad Commission has those powers delegated to it by the Legislature. In my opinion, the Legislature has not provided for the fixing of gas prices by the Commission under the circumstances here present, and has not authorized the Commission to compel the gas company to take the gas at the price fixed by it.