**SEAGULL ENERGY E & P, INC., Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS, Appellee.**

No. 03–02–00352–CV.

Court of Appeals of Texas, Austin.

Jan. 16, 2003.

Rehearing Overruled March 6, 2003.

Michael E. McElroy, Mickey R. Olmstead, Gregory S. Friend, McElroy, Sullivan, Ryan & Miller, L.L.P., Austin, for appellant.

Priscilla M. Hubenak, Assistant Attorney General, Austin, for appellee.

Before Justices KIDD, B.A. SMITH and YEAKEL.

## OPINION

MACK KIDD, Justice.

This case is an appeal from a Railroad Commission ("the Commission") order denying an exception to the well spacing and density field rules in the Waskom (Cotton Valley) Field. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000). Seagull Energy E & P, Inc. ("Seagull") chose to shut in its gas well, which produced from only one of three gas deposits underlying its lease, and drill a second well it hoped would reach all three deposits. When the second well was unable to produce gas from the deposit in which the first well had been completed, Seagull applied for a spacing and density exception in an attempt to operate both wells simultaneously. *See* 16 Tex. Admin. Code §§ 3.37, .38 (2002) (Tex. R.R. Comm'n, Statewide Spacing Rule, Well Densities). The Commission denied the application. Seagull appealed to a Travis County district court, arguing that

the Commission did not have the power to consider three gas deposits, not in natural pressure connection, as a single reservoir for spacing and density purposes. Therefore, Seagull contends that it was as a matter of law entitled to produce from at least one well completed in each separate reservoir. The district court affirmed the Commission's order, reasoning that the Commission's actions fell within its power to regulate natural gas production. We agree with that determination and will affirm.

## BACKGROUND

Seagull holds the 115.64–acre Albert Davis Lease ("Seagull's lease"), which lies in the Waskom (Cotton Valley) Field. The Waskom (Cotton Valley) Field has been active for more than 46 years.[1] It is composed of "lenticular sands"; in other words, there are multiple natural gas accumulations contained throughout an area with a roughly uniform geologic makeup.[2]

▮ The location of oil and gas wells is usually determined according to the statewide rules on well spacing and density. *See* 16 Tex. Admin. Code §§ 3.37, .38. Spacing rules control the distance between wells that are drilled into the same oil or gas accumulation at the same depth. *Id.*

---

1. The Waskom (Cotton Valley) Field was originally discovered on September 19, 1955, and the Commission adopted field rules effective November 5, 1956. In 1983, another field, the Waskom (Cotton Valley, Lo) Field, which had been designated in 1975, was consolidated into the Waskom (Cotton Valley) Field, and new rules were adopted for the consolidated field. Those rules have been amended twice since then, in 1985 and 1991.

2. A "lens" is a relatively porous sedimentary deposit surrounded by impervious rock. *See* Howard Williams & Charles Meyers, *Manual of Oil and Gas Terms* 575 (11th ed.2000). When a lens is saturated with oil or natural

gas, it is described as a "lenticular reservoir." *Id.* A "sand" is a deposit of sandstone, a permeable rock in which oil and gas deposits are often found. *Id.* at 983. Thus, the lenticular sands involved in this case are separate sandstone deposits, scattered throughout the Waskom (Cotton Valley) Field, in which natural gas can be found. Lenticular sands usually comprise a series of thin gas deposits which would often not be economically feasible to produce by sinking a separate well into each deposit. *See* 2 Ernest Smith & Jaqueline Weaver, *Texas Law of Oil and Gas*, § 10.4(c)(1) (2d ed.1998).

§ 3.37(k). Density rules establish the minimum number of acres allocated to each drilled well. Exceptions to either set of rules are to be granted when necessary to prevent either hydrocarbon waste or property confiscation. *See id.* § 3.37(a)(1). Each landowner or leaseholder,[3] in order to have a fair chance at recovering the oil and gas beneath a given lease, has a right to the opportunity to drill at least one well on the property. *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 562 (1948).

When the Commission designates a "field," it may establish "field rules" for that area which supersede the general spacing requirements, taking into account the particular geologic makeup of the producing land.[4] Leaseholders, however, are still entitled to drill a well if they meet the requirements for an exception to the statewide rules. *See* Tex. Admin. Code § 3.37(a)(1). The field rules for the Waskom (Cotton Valley) Field require that wells be spaced so that no more than one well exists per 80 acres. Furthermore, a well must be located at least 660 feet from the nearest lease or property line and 1,320 feet from the nearest well on the same lease completed in the same field.

Seagull has been producing gas from its lease since 1974. In 1991, Seagull completed a new well, designated "Well # 1," which produced only from the "C" sand. However, several other gas deposits underlay Seagull's lease. In June 2000, Seagull voluntarily shut in[5] Well # 1 to be able to drill a second well, "Well # 4." Because Well # 4 would only be 1,200 feet away from Well # 1, and the two wells were to be located on fewer than 160 acres, drilling Well # 4 while Well # 1 was in production would have violated the field rules. Seagull intended for Well # 4 to produce gas from the C sand while also producing from two other deposits, the "Stroud" and "Taylor" sands. However, Well # 4 was unable to produce gas from the C sand. Well # 4 did, however, produce gas from the Taylor and Stroud sands. Thus, Seagull found itself with one well producing gas from the Taylor and Stroud sands and a second, shut-in well capable of producing gas from the C sand.

Hoping to be able to produce from all three sands simultaneously, Seagull applied for a spacing and density exception. The Commission set the application for a contested case hearing, during which the application was contested by a well opera-

3. The holder of a mineral rights lease holds the property rights in the mineral estate as a fee simple determinable. So long as lease conditions are met, the leaseholder owns the mineral estate. *See Rogers v. Ricane Enters.*, 884 S.W.2d 763, 766–7 (Tex.1994); 1 Smith & Weaver, *supra* note 2, at § 2.2.

4. The definition of the word "field" is variable; in some instances it refers to a particular reservoir, and sometimes to an entire geographical area from which oil or gas is produced. *Railroad Comm'n v. Rio Grande Valley Gas Co.*, 405 S.W.2d 304, 309 (Tex.1966). For purposes of interpreting the Natural Resources Code, the Texas Supreme Court has defined a "field" as a gas or oil deposit that is not in natural pressure connection with any other deposit. *See Amarillo Oil v. Energy–*

*Agri Prods.*, 794 S.W.2d 20, 23–24 (Tex.1990). Field rules are special rules that modify the Commission's well spacing, density, prorationing, and casing requirements for designated fields to deal with differences in geologic conditions in a geographic area. *See* 2 Smith & Weaver, *supra* note 2, § 9.3(c). They do not regulate all physically separate oil and gas accumulations as a whole, but set the criteria for dealing with each separate common reservoir within the area. *See* 2 *id.* § 9.4(c).

5. To "shut in" a well means to close down a producing well voluntarily. *See* Williams & Meyers, *supra* note 2, at 1025. In this case, Seagull placed a concrete plug at the bottom of Well # 1.

tor on an adjacent lease. The hearing examiners, in their proposal for decision, recommended that the Commission deny Seagull's application because Seagull had not met its burden of proof in applying for the spacing and density exceptions. The Commission accepted the examiners' findings and denied the application.

Seagull sought review of the Commission's final order in a Travis County district court. At trial, Seagull took the position that the Commission had to treat each separate sand as a separate reservoir when deciding whether to allow simultaneous production from the two wells. The trial court affirmed the Commission's decision, and Seagull appealed to this Court.

Relying on *Benz–Stoddard v. Aluminum Co. of America*, 368 S.W.2d 94 (Tex. 1963), and its progeny, Seagull argues that, while the relevant statutory language gives the Commission power to group lenticular sands from which oil or gas is commingled for pooling and prorationing purposes, the Commission does not have the statutory authority to disregard Seagull's property interest in the C sand by treating the three disconnected sands as a common reservoir for spacing and density purposes. Therefore, Seagull believes that as a matter of right it should be entitled to produce gas simultaneously from both Well # 1 and Well # 4; any other result, it contends, would deny it the right to drill a "first well" into each separate "reservoir" underlying Seagull's lease. The Commission, citing *Railroad Commission v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36 (Tex. 1991), replies that, although some cases appear to support Seagull's contentions, they have been limited by amendments made to the Natural Resources Code ("the

Code") in 1979 and 1981; according to the Commission, those amendments give the Commission broad authority to regulate the production of gas for which a commingled production permit has been issued. *See* Tex. Nat. Res.Code Ann. §§ 86.012(b), .081(b) (West 2001).

## DISCUSSION

The unique facts of this case make it one of first impression. Seagull has requested permission, under a rule that regulates the location of wells, to produce natural gas from a well that has previously been drilled, then shut in. Thus, we are not asked to decide whether Seagull has a right to *drill* on its property, but whether it has a right to *produce* simultaneously from two natural gas wells that have already been drilled.[6] Both sides concede that no authority exists directly on point. Seagull asks us to remand for further proceedings on the grounds that the Commission has prejudiced Seagull's substantial rights and violated the constitution, and that the Commission's actions are outside the scope of its statutory authority. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000).

An administrative agency has only the powers conferred upon it in clear and unmistakable language. *Public Util. Comm'n v. City Public Serv. Bd.*, 53 S.W.3d 310, 315–16 (Tex.2001) (citing *Humble Oil & Refining Co. v. Railroad Comm'n*, 133 Tex. 330, 128 S.W.2d 9, 15 (1939)). When the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *Public Util. Comm'n v. GTE–Southwest, Inc.*, 901

---

6. "Drilling" is usually defined as the act of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities. Williams & Meyers, *supra* note 2, at 304. "Production" is defined either as the act or process of producing oil or gas, or the oil and gas actually obtained through recovery operations. *Id.* at 849–51.

S.W.2d 401, 407 (Tex.1995); *Kawasaki Motors v. Motor Vehicle Comm'n,* 855 S.W.2d 792, 797 (Tex.App.-Austin 1993, no writ). An agency may not, however, exercise what is effectively a new power or a power contradictory to the statute on the theory that such an exercise will be expedient for the agency's purposes. *GTE–Southwest,* 901 S.W.2d at 407; *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137–38 (Tex.App.-Austin 1986, writ ref'd n.r.e.). Our task, then, is to determine whether the language of the Code gives the Commission authority to prohibit Seagull from producing natural gas from both of its two wells simultaneously.

The Commission has been granted its authority against the background of the common law. *See, e.g., Ryan Consol. Petroleum Corp. v. Pickens,* 155 Tex. 221, 285 S.W.2d 201, 208 (1955). A Texas landowner owns the oil and gas beneath the surface of his lease. *See Railroad Comm'n v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 579, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940). At the same time, under the "rule of capture," a landowner has legal title over all gas that he drains from any well located on his land. *Id.* In general, this principle has been interpreted to give each landowner the right to drill a "first well" on his property, *see Gulf Land Co. v. Atlantic Ref. Co.,* 134 Tex. 59, 131 S.W.2d 73, 80 (1939), even though it might otherwise violate the Commission's spacing and density rules. *See* Tex. Admin. Code § 3.37(a)(1). However, *production* from such wells is always subject to the Commission's authority to prorate production and adjust the amount of oil or gas produced by each landowner.[7] *See, e.g., Benz–Stoddard,* 368 S.W.2d at 98. Thus,

the right to drill is balanced against the interests of all the other landowners in an area not to have the oil and gas reserves depleted through inappropriate waste and overproduction. *See Texaco, Inc. v. Railroad Comm'n,* 583 S.W.2d 307, 310 (Tex. 1979); *Exxon Corp. v. Railroad Comm'n,* 993 S.W.2d 704, 709–10 (Tex.App.-Austin 1999, no pet.). A landowner's property right in the oil and gas beneath a tract only exists in light of the Commission's rules promulgated under the conservation laws. *Musick v. Railroad Comm'n of Tex.,* 747 S.W.2d 892, 896 (Tex.App.-Austin 1988, writ denied). Therefore, Seagull's claims, whether based on constitutional, property right, or administrative procedure grounds, depend on our interpretation of the Commission's statutory authority.

Seagull contends that the sections of the Code giving the Commission authority to treat discrete gas deposits as a single pool or common reservoir apply only to the Commission's power to issue prorationing and forced pooling orders. Seagull bases this contention on its understanding of the history of the 1979 and 1981 amendments, contending that the Code guarantees a right to a separate well in each separate gas accumulation underlying the lease to every mineral leaseholder. For Seagull's purposes, the narrative begins in 1963 with the supreme court's decision in *Benz–Stoddard v. Aluminum Co. of America.* That case involved a dispute between the owner on a relatively small lease, Claire Benz–Stoddard, and the holder of larger adjacent leases, Aluminum Company of America ("ALCOA"). Benz–Stoddard's tract overlaid ten vertically

---

7. Pursuant to its statutory obligation to prevent waste, the Commission even has the power to limit production from all wells, regardless of which lease they are on, in order

to protect the common reserves. *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961, 967 (1945).

separated gas "reservoirs or horizons." [8] *Benz–Stoddard*, 368 S.W.2d at 96. Under a permit issued by the Commission, Benz–Stoddard drilled a single wellbore from which she connected with three out of the ten accumulations. The multiple completions allowed her to recover more than seven times the gas actually in place beneath her tract.

ALCOA challenged the Commission's order allowing multiple completions on the grounds that, under the applicable pro-rationing scheme, Benz–Stoddard would have been able to recover all of her share of the natural gas resources below her land by completing a well in only one of the gas accumulations. This Court agreed with ALCOA and overturned the Commission's order, holding that the statute did not entitle landowners to multiple well completions so long as a well drilled into any one of the accumulations provided sufficient natural gas to protect the landowners' property interests. *Aluminum Co. of America v. Benz–Stoddard*, 357 S.W.2d 809, 811 (Tex.Civ.App.-Austin 1962, writ granted). The Texas Supreme Court reversed, stating that the Commission was correct in treating the several accumulations separately for the purposes of granting an exception to the statewide spacing rules. *Benz–Stoddard*, 368 S.W.2d at 97.

The supreme court based its conclusion on a statutory provision stating that multiple completions made through a single borehole shall each be regarded as a separate well. *Id.; see* Act of May 1, 1935, 44th Leg., R.S., ch. 120, § 1, 1935 Tex. Gen. Laws 318 (amended 1977) (current version at Tex. Nat. Res.Code Ann. § 86.003 (West 2001)).[9] Because the statute states that each separate completion in essence constitutes a separate well, the Commission had authority to treat each completion as a "first well." *Benz–Stoddard*, 368 S.W.2d at 97. Following *Benz–Stoddard*, the supreme court relied on this analysis to reverse a Commission order applying a uniform prorationing order to four separate oil fields. *Railroad Comm'n v. Shell Oil Co.*, 380 S.W.2d 556, 559 (Tex. 1964) ("[T]he law contemplates that the Railroad Commission will treat and regulate reservoirs separately, which are physically separate and not connected, even though they may underlie the same tract of land."). Similarly, the court overturned Commission orders prorating gas from unconnected reservoirs in two cases that dealt with prorationing orders issued for the Boonesville Field:[10] *Railroad Commission v. Graford Oil Corp.*, 557 S.W.2d 946 (Tex.1977), and *Gage v. Railroad Commission*, 582 S.W.2d 410 (Tex.1979). The *Graford* court reasoned that, because the Commission could prorate and regulate gas only in each "common reservoir," the Commission could only prorate gas in deposits that had been shown to be naturally

---

**8.** A "horizon" is an area within a geologic formation which is sufficiently porous and permeable to form a petroleum reservoir. Williams & Meyers, *supra* note 2, 497. Although the term "field" has been used to designate a geographic region situated over a collection of oil and gas accumulations, the definition is somewhat imprecise. *See Railroad Comm'n v. Rio Grande Valley Gas Co.*, 405 S.W.2d 304, 309 (Tex.1966). The Texas courts in interpreting the Natural Resources Code have traditionally applied the word "field" to each physically separate productive accumulation under a single lease. *E.g., Bol-*

*ton v. Coats*, 533 S.W.2d 914, 917 (Tex.1975). To avoid confusion, we will refer to oil and gas "accumulations" when not referring specifically to lenticular sand deposits.

**9.** The current version is substantially identical to the 1963 statute.

**10.** The Boonesville Field, like the Waskom (Cotton Valley) Field, is comprised of a series of disconnected lenticular natural gas deposits. *Gage v. Railroad Commission*, 582 S.W.2d 410, 414 (Tex.1979).

pressure connected. *Graford,* 557 S.W.2d at 949–50. Only a fact-finding showing that the consolidated area "is found to be a common pool or common accumulation of hydrocarbons" would suffice to support a prorationing order covering that area. *Id.* at 950. When, in *Gage,* the Commission again attempted to treat physically separate reservoirs as a single "common reservoir," the Supreme Court again reversed. "[I]t is settled," the *Gage* court wrote, "that separate and distinct 'common reservoirs' cannot be consolidated into a single field for administrative convenience in prorateing the area." *Gage,* 582 S.W.2d at 414 (citing *Graford,* 557 S.W.2d at 950; *Shell,* 380 S.W.2d at 559; and *Benz–Stoddard,* 368 S.W.2d at 97).

The legislature responded to *Graford* and *Gage* quickly. As introduced, Senate Bill 257 would have changed the definition of "common reservoir" to include "multiple stratigraphic or lenticular accumulations of oil or oil and gas, all intervals of which may not be pressure connected." Tex. S.B. 257, 66th Leg., R.S. (1979). However, the bill did not pass in this form. As reported, the final bill only amended sections 85.046 and 86.012 of the Code to add identical subparagraphs allowing the Commission to permit commingled production from separate natural gas accumulations based on a finding that such production would "prevent waste, promote conservation, or protect correlative rights." Act of May 27, 1979, 66th Leg., R.S., ch. 300, 1979 Tex. Gen. Laws 673 (current version at Tex. Nat. Res.Code Ann. §§ 85.046(b), 86.012(b) (West 2001)).

Again in 1981, the legislature attempted to expand the definition of "common reservoir" to include gas reservoirs "whether or not the intervals of the formation or sequence are pressure connected." Tex. S.B. 1146, 67th Leg., R.S. (1981). Instead, the legislature enacted a provision stating that, when the Commission permits commingled production from non-connected gas deposits, it has the power to "prorate, allocate, *and regulate*" production "*as if* they were a single common reservoir." Act of June 16, 1981, 67th leg., R.S., ch. 688, § 3, 1981 Tex. Gen. Laws 2578 (codified at Tex. Nat. Res.Code Ann. § 86.081(b) (West 2001)) (emphasis added). Although the 1981 amendment failed once again to expand the statutory definition of "common reservoir," this Court has observed that it clearly overturned *Graford* and *Gage. See Railroad Comm'n v. Mote Res.,* 645 S.W.2d 639, 644 (Tex.App.-Austin 1983, no writ).

Seagull disputes the effect on *Graford* and *Gage* on the 1981 amendment. According to Seagull, the fundamental question of the Commission's authority rests in its ability to regulate each "field" or "common reservoir." For the purpose of interpreting the Commission's authorizing statute, the statutory definition of both terms, which are usually considered to be synonymous, is that of a "physically separate" accumulation of gas or oil. *See Amarillo Oil Co. v. Energy–Agri Prods., Inc.,* 794 S.W.2d 20, 23–24 (Tex.1990).[11] According to Seagull, if the three sands do not meet the definition of "common reservoir," then a rule 37 exception must be granted. Seagull argues that, for the Commission to promulgate a valid order or field rule, it would first need to establish that all affected gas accumulations were in natural communication with each other. Seagull concludes that, because the Commission has

---

**11.** The Commission's rules take this into account by providing that, generally, each spacing order must be allocated for each separate accumulation of oil or gas at a particular depth. *See* 16 Tex. Admin. Code § 3.37(k); *see also* 2 Smith & Weaver, *supra* note 2, § 9.4(c).

not made a finding that the three sands underneath Seagull's lease are naturally connected the Commission *must* treat each sand separately by allowing Seagull to produce from both wells.

The Commission responds that, under *Pend Oreille*, it has broad regulatory authority over gas production when, as here, gas is to be produced in a commingled state. *See Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 46 (Tex.1991). *Pend Oreille* involved the Commission's implementation of a forced pooling order under the Mineral Interest Pooling Act. *See* Tex. Nat. Res.Code Ann. §§ 102.001–.112 (West 2001). Under that Act, only oil and gas from a "common reservoir" could be subject to a forced pooling order. *Id.* In *Pend Oreille*, the pooled reservoir comprised two separate gas deposits that had been put into manmade communication through a common wellbore. *Pend Oreille*, 817 S.W.2d at 38. The Thirteenth Court of Appeals, relying on *Graford* and *Gage*, held that the Commission lacked authority to treat separate deposits of gas that are in man-made communication as a common reservoir for pooling purposes. *Pend Oreille Oil & Gas Co. v. Railroad Comm'n*, 788 S.W.2d 878, 883 (Tex.App.-Corpus Christi 1990, writ granted). The Texas Supreme Court reversed. In assessing the scope of the Commission's authority over commingled gas deposits, the *Pend Oreille* court analyzed the 1979 and 1981 amendments. The court specifically rejected the argument that the Commission's regulatory authority over commingled reservoirs did not extend to pooling because the Legislature had "resisted any interpretation of the term 'common reservoir' that would have limited the commission's regulatory authority." *Id.* at 46. After reviewing *Graford* and *Gage*, together with the legislative history of the amendments, the supreme court declared that "the legislature *does* intend the railroad commission to have discretion in regulating commingled oil and gas." *Id.* Hence, the court held that the terms "prorate, allocate, and regulate," added by the 1981 amendment, "and especially the broad word 'regulate,' . . . evidence an intention to grant the commission broad authority over gas production from commingled reservoirs." *Id.*; Tex. Nat. Res.Code Ann. § 86.081(b).

Relying on *Benz–Stoddard*, Seagull attempts to cast this case as resolving the extent of a leaseholder's right to *drill* into the separated accumulations of natural gas beneath his lease.[12] By contrast, the Commission characterizes this dispute as one concerning the right to *produce* natural

---

**12.** If we accepted Seagull's position, we would be extending *Benz–Stoddard's* holding to encompass the facts of this case. *Benz–Stoddard* affirmed the Commission's order allowing separate completions in three of the ten gas reservoirs underneath Benz–Stoddard's tract. This outcome was based on an analysis of the statutory language of the Natural Resources Code. Under *Benz–Stoddard*, therefore, the Commission had the authority to grant Seagull, after shutting in Well # 1, the opportunity to complete Well # 4 in all three sands underneath its lease. Out of those three natural reservoirs, Seagull has completed connections in two. *Benz Stoddard* would support Seagull's argument that it

has a right to drill a separate well into the C sand if commingled production had not been authorized and no well had yet been completed in the C sand. *See* 16 Tex. Admin. Code § 3.37(k) (2002) (stating that rule 37 exceptions for drilling permits are to be considered separately for each accumulation in which completion could be made).

In this case, however, Seagull characterizes *Benz–Stoddard* as giving it the right to *produce* natural gas from every separate reservoir underneath its property. We therefore base our analysis not on *Benz–Stoddard* but on the scope of the Commission's statutory authority to regulate production.

gas;[13] the right to drill a well has always been subject to the Commission's statutory authority to control the amount produced from that well in such a way that "no unreasonable hardship need result." *Benz–Stoddard,* 368 S.W.2d at 98; *see also Shell,* 380 S.W.2d at 559. In this case, both Well # 4 and Well # 1 have already been drilled. While Seagull argues for a right to *drill,* in actuality it seeks the right to *produce* from both wells simultaneously.

When a permit for commingled production has been issued, the Commission has authority to regulate that production. The 1979 and 1981 amendments confer authority on the Commission in two steps. Under the 1979 amendment, the Commission has authority to issue a permit for commingled production when it will promote conservation, avoid waste, or protect correlative rights. Tex. Nat. Res.Code Ann. § 86.012(b). Under the 1981 amendment, the commission has the power to "regulate" the commingled production from disconnected reservoirs "as if they were a common reservoir." *Id.* § 86.081(b). As in *Pend Oreille,* the technical question of whether these three gas accumulations *actually* constitute a natural common reservoir is not dispositive because, upon granting a permit for commingled production, the Commission gained the authority to regulate production from the Taylor, Stroud, and C sands *as if* they were a common reservoir. Seagull has not challenged the permit allowing it to drill Well # 4, which allowed commingled production. That order contemplated that the three reservoirs would be treated as a single administrative unit, subject to a showing that such production would promote con-

servation, reduce waste, and promote correlative rights. *Id.* § 86.012(b). Because it made the necessary findings to authorize commingled production on Seagull's lease, the Commission may now exercise the regulatory authority given to it by the 1981 amendment regarding all three accumulations.

 Having held that the power given to the Commission by the 1981 amendment applies to the three commingled lenticular sands, we must still decide whether that power allows the Commission to restrict gas production from one of two wells drilled into several reservoirs for which a commingled production permit has been issued. Seagull would have us dismiss *Pend Oreille's* broad reading of section 86.081(b) as *obiter dictum,* applying at most to prorationing and involuntary pooling orders. We disagree with that assessment. While we grant that *Pend Oreille* was decided in the context of the Mineral Interest Pooling Act, the supreme court construed the 1979 and 1981 amendments, and the implication of those amendments for the Commission's power to regulate natural gas production, as a general matter. Section 86.081 gives the Commission authority to prorate, allocate, and regulate commingled production of natural gas. *Pend Oreille* construes the word "regulate" to give the Commission broad authority, not merely the narrow power to issue prorationing orders for artificially connected gas reservoirs. This broad reading was appropriate; like the field in this case, the gas field in *Pend Oreille* was made up of discontinuous gas accumulations. In the type of field involved in these cases, down-

---

13. In responding directly to Seagull's drilling argument, the Commission would have us declare that it has the authority to regulate drilling in any group of disconnected gas reservoirs as if they were a natural common reservoir. We need not answer this question because both wells have already been drilled. Our analysis is limited to the scope of the Commission's authority to regulate *production* from separate reservoirs for which a permit allowing commingled production has already been issued.

hole commingling is often the most efficient way to produce natural gas without causing waste. *See Pend Oreille,* 817 S.W.2d at 38 n. 4 (citing 2 Earnest Smith & Jaqueline Weaver, *Texas Law of Oil and Gas* § 10.4[C](1) (1st ed.1990)); *see also Gage,* 582 S.W.2d at 414 (efficient exploitation of separate gas accumulations in area with lenticular sands presented "enormous regulatory and technological problems"). The 1981 amendment ensures that the Commission will have the regulatory tools to manage and conserve these gas reserves. Because it is predicated on a finding that it will prevent waste and protect correlative rights, we believe, as did the supreme court in *Pend Oreille,* that the power to *regulate production* embraces the power to prohibit a leaseholder from producing gas from two different wells *simultaneously,* so long as that leaseholder has not proven that hydrocarbons are being drained from his property or wasted.

■ Because we understand the 1979 and 1981 amendments to give the Commission specific regulatory powers over commingled natural gas production, we hold that, in issuing a permit for commingled gas production from separate reservoirs, the commission gains authority to exercise those powers over those reservoirs. Those powers include the authority to restrict production in one of two wells completed into such a group of reservoirs. Therefore, we overrule Seagull's issue regarding the scope of the Commission's authority.

■ The only remaining question is whether the Commission acted properly in denying Seagull's application for an exception to the Waskom (Cotton Valley) Field rules on spacing and density. Although a landowner or leaseholder is entitled to a "first well" on its property, entitling it to its fair chance to recover oil or gas, a landowner or leaseholder has no right to a

*second well* in the same common reservoir without demonstrating in a contested case hearing that there is drainage or waste. *See Texaco Producing, Inc. v. Fortson Oil Co.,* 798 S.W.2d 622, 624 (Tex.App.-Austin 1990, no writ) (producer must demonstrate that reserves underlying his land are being drained and that he does not have opportunity to offset that drainage to establish injury to his correlative rights as matter of law). Because the Commission properly treated the separate reservoirs as a single reservoir for production purposes, Seagull had the burden in the contested case proceeding to demonstrate that it needed to produce natural gas from Well # 1 in order to protect its interests.

■ We review the Commission's final orders in contested cases under the "substantial evidence" test. *See Pend Oreille,* 817 S.W.2d at 40–41; *H.G. Sledge v. Prospective Inv. & Trading,* 36 S.W.3d 597, 602 (Tex.App.-Austin 2000, pet. denied). We must ask whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion that the agency must have reached to justify the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988); *Heat Energy Advanced Tech., Inc. v. West Dallas Coalition,* 962 S.W.2d 288, 294–95 (Tex.App.-Austin 1998, pet. denied). The appealing party has the burden to demonstrate that there was not substantial evidence to support the agency's order. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). The evidence in the record may actually preponderate against the agency's decision, but still satisfy the substantial evidence requirement. *Id.*

The Commission's decision was based on evidence provided to it by Seagull. At the contested case hearing, Seagull presented a calculation of the remaining reserves

that could be reached through Well #1, based on its contention that it had a right to a separate "first well" in the C sand. This included generalized information about the gas deposits contained in the C sand. Seagull's expert stated that, although any analysis of all three sands together would be "highly interpretative," the three sands, taken together, would produce a volume of approximately 1.7 billion cubic feet. Seagull also admitted that it had another well on another lease producing gas from the C sand. All of Seagull's evidence to support a finding of confiscation or drainage sufficient to support a spacing or density exception is based on the gas reserves in the C sand *alone*. Instead of presenting evidence that it was suffering unfair drainage from the three sands taken as a single unit, Seagull has only provided evidence that it is unable to obtain any gas from the C sand through Well #4. Having reviewed the administrative record, we believe that there was sufficient evidence for the Commission to rule as it did. Accordingly, we overrule Seagull's issue.

## CONCLUSION

We have held that, once the Railroad Commission has issued a permit for production of natural gas from a group of separate lenticular sands for commingled production, it has regulatory authority to consider those lenticular sands as a single common reservoir for purposes of production allocation. Accordingly, because the Commission's order was supported by substantial evidence, we affirm the trial court's decision.